## ALVALONZIE GRAHAM v. STATE OF MARYLAND

[Nos. 319 and 320, September Term, 1980.]

*Decided November 14, 1980.*

The cause was argued before WILNER, COUCH and WEANT, JJ.

*Gary W. Christopher, Assistant Public Defender,* with whom were *Alan H. Murrell, Public Defender,* and *Martha Weisheit, Assistant Public Defender,* on the brief, for appellant.

*Diane G. Goldsmith, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General, Andrew L. Sonner, State's Attorney for Montgomery County,* and *John D. Duncan, Jr., Assistant State's Attorney for Montgomery County,* on the brief, for appellee.

WILNER, J., delivered the opinion of the Court.

Appellant first came to the attention of the law, in terms of these cases, on the evening of September 12, 1979. Officer Thomas Gallogly, of the District of Columbia police force, observed a moped, upon which appellant was a passenger, cruising along the streets in the District in violation of a number of traffic laws. The moped was speeding; it failed to stop at one or more red lights; it had no lights on; and it did not display the license tags required in the District. Officer Gallogly stopped the vehicle.

Based upon what Gallogly learned then, and later, appellant ended up being charged, in separate indictments, with (1) statutory daytime housebreaking, theft of money, and theft of a check (No. 23062), and (2) theft of the moped (No. 23465). He was subsequently convicted of the theft of the check under No. 23062, and theft of the moped under No. 23465, and has appealed. For convenience, and because both appeals arise, in part, from the same underlying facts, we shall deal with them both in this one Opinion.

When Officer Gallogly stopped the moped, he asked the driver for his license and registration. The driver indicated that the moped belonged to appellant, who advised Gallogly that he had left the papers at his home but could not retrieve them because he did not have keys to the house. Appellant told Officer Gallogly that the moped was registered with the Department of Motor Vehicles and that the license tags had fallen off. Additionally, he told the officer that he had purchased the moped in the 2100 or 2200 block of Bladensburg Road for $395 plus $25 tax.

By this time, Officer Gallogly was highly suspicious. Though familiar with the area, he could not recall a moped dealership in either of the blocks mentioned by appellant, and the District's 8% sales tax on new vehicles would require over $30, not $25, in taxes. His observation of the bike also led him to suspect that it had been "hot-wired."

In an attempt to check appellant's story, Officer Gallogly ran appellant's name through the police computer and was advised that a bench warrant, arising from an unrelated

traffic offense, was outstanding against him. Appellant was thereupon placed under arrest by virtue of the extant warrant. Still trying to determine if the moped was stolen, Officer Gallogly located and made note of the serial number on the frame of the vehicle and had it checked. There was no vehicle with that number reported as registered with the District Motor Vehicle Department, but neither had the bike been reported stolen. Appellant and his moped were taken to the police station.

At the time of his arrest, appellant had in his possession a blue backpack, which he claimed belonged to him. When appellant and Gallogly reached the station, appellant, about to be placed in a cell pending pretrial release arrangements, was relieved of the backpack. The contents were inventoried in the normal course of police business, and appellant was told that he could retrieve the bag and its contents upon his release.

The next morning, Officer Gallogly, by phoning several moped dealerships in the area, ascertained that the vehicle in question had been sold to a Mr. Quigley several weeks earlier. The officer then contacted Mr. Quigley, who said that the vehicle had been stolen from his porch two evenings earlier, along with a blue backpack with a white pine tree stenciled on the back. Quigley also described the contents of the backpack when it was taken. Quigley's description matched the backpack, and some of its contents, taken from appellant the previous evening. Gallogly immediately called the desk sergeant's office and asked to be advised if appellant came to claim the moped or the backpack. The response was that appellant was there at that time. Officer Gallogly went to the lobby and placed appellant under arrest for stealing the moped. He took appellant inside the security area of the station where he removed the backpack from appellant's possession.[1]

In Officer Gallogly's office, appellant was informed of his *"Miranda"* rights and, upon inquiry, again asserted that the

---

1. Appellant stated that he retrieved the backpack earlier in the morning and had it with him when he returned later to claim the moped.

backpack and its contents were his. Officer Gallogly dumped out the contents of the pack and saw a check signed by one Linda Laux.[2] When asked about the check, appellant stated that Ms. Laux was "some chick I know in Chevy Chase." Officer Gallogly called Ms. Laux, who informed him that she did not know appellant, but that her home had been broken into a few days earlier, and a check had been taken from a checkbook in her purse.

The two indictments followed.

Appellant appeals his conviction on No. 23465 (theft of the moped) on the ground that, at the time of the initial stop on September 12, the officer conducted an illegal search of the moped to locate the serial number. His appeal on No. 23062 (theft of the check) is premised upon the complaint that, following appellant's second arrest on September 13, Officer Gallogly conducted an unlawful search of the backpack, which revealed the check.

With respect to both of appellant's challenges, there is the threshold question of whether he has "standing" even to make the challenge — whether he is in a position to claim the benefit of the Fourth Amendment guarantee. Neither trial court chose to address that issue. Instead, the first court (in No. 23465) concluded that the "search" of the moped was not a search at all or, if it was a search, was valid under either the "plain view" doctrine or as being incident to a valid arrest.

With respect to appellant's second challenge — the search of the backpack — the trial court chose to assume appellant's "standing" and concluded, on the merits of the question, that the search was valid as incident to a lawful arrest.

The court's reluctance to address the more thorny "standing" issue is easily understood and is not uncommon.

---

**2.** Officer Gallogly testified (in No. 23062) that the check was lying loose in the backpack and that he observed it when he emptied the contents. Appellant maintained that the check was in his wallet (which was in the backpack), and implied that Gallogly discovered it by searching his wallet. The court believed Gallogly, however, and we cannot say that it was clearly erroneous in doing so. Thus, we do not have a situation to which *Arkansas v. Sanders,* 442 U.S. 753 (1979), and *Liichow v. State,* 288 Md. 502, 419 A.2d 1041 (1980), would directly pertain.

*See, e.g., United States v. Huslage,* 480 F. Supp. 870, 875 (W.D. Penn. 1979). However, the "standing" question is a preliminary one that should be resolved, for if appellant has no lawful right to contest the respective searches, the question of their validity becomes moot. Putting the cart before the horse may sometimes be easier to do, but it does make the ultimate journey considerably more difficult.

We therefore must consider the question: Does appellant have legitimate "standing" or capacity to object to the search of a backpack or a moped that he had stolen only a day earlier, and to which he had no lawful right of possession?

The very wording of the Fourth Amendment would seem to provide the answer. It states, in relevant part, that "[t]he right of the people to be secure in *their* persons, houses, papers. and effects, against unreasonable searches and seizures, shall not be violated. . . ." (Emphasis supplied.) The Amendment says nothing about any right to be secure against the search and seizure of *someone else's* person, house, papers, or effects.

But, for some reason, things are never quite so easy in the law. And so, from these seemingly plain words used in the Constitution, there has developed the complex concept of "standing." When may a person be heard to complain that *his* Fourth Amendment right has been violated?

The history of "standing" in search and seizure cases is a long one, but, for our purpose, we may start with *Jones v. United States,* 362 U.S. 257 (1960). In *Jones,* the Supreme Court addressed the dilemma faced by a defendant charged with the unlawful possession of some contraband item who desired to challenge the search or seizure that led to discovery of that item by the police. Under the law then current, in order to have the requisite "standing" as someone "aggrieved" by the search or seizure, he had to show the very possession of the item that later would be used against him at trial.

As pointed out in *Rakas v. Illinois,* 439 U.S. 128, 135 (1978), the *Jones* Court attempted to resolve this type of

"Catch-22" situation through two alternative holdings: "It established a rule of 'automatic' standing to contest an allegedly illegal search where the same possession needed to establish standing is an essential element of the offense charged; and second, it stated that 'anyone legitimately on premises where a search occurs may challenge its legality by way of a motion to suppress.' "

We are not concerned here with the first of these holdings — that of "automatic standing" — as it has since been abrogated as a principle of law emanating from the Fourth Amendment. *See United States v. Salvucci,* 448 U.S. 83, 65 L. Ed. 2d 619 (1980); *Rawlings v. Kentucky,* 448 U.S. 98, 65 L. Ed. 2d 633 (1980), and *compare Duncan and Smith v. State,* 276 Md. 715 (1976), reversing *Duncan and Smith v. State,* 27 Md. App. 302 (1975).[3]

Our interest in *Jones* as a starting point is in the second criterion — the legitimacy of presence or possession.

The *Jones* Court refused to consider the matter of "legitimacy" solely by reference to distinctions arising in the civil law of property, which is characterized as being "often only of gossamer strength." 362 U.S. at 266. But it nevertheless made clear that its broader concept of legitimacy of presence "would of course not avail those who, by virtue of their wrongful presence, cannot invoke the privacy of the premises searched." *Id.* at 267. Thus, even under the broad "standing" criteria of *Jones,* the lawfulness of the challenger's presence in or possession of the place searched or item seized was a critical factor. *See Rakas, supra,* 439 U.S. at 140-41.

It became even more critical after *Rakas.* Reexamining *Jones,* the Court began anew with the underlying premise

---

**3.** The controversy over "automatic standing" may not yet be over in Maryland. The holdings in *Salvucci* and *Rawlings* were grounded on the Fourth Amendment, and do not necessarily preclude the discovery of "automatic standing" under State law. That very issue, in fact, is currently before the Court of Appeals in *Gahan v. State* (No. 80-41, *cert. granted* July 3, 1980). Whether that Court will continue to accord the "great respect" it has in the past to Supreme Court Fourth Amendment decisions when dealing with analogous provisions of State law (*see, for example, Givner v. State,* 210 Md. 484, 498 (1956)), remains to be seen.

that Fourth Amendment rights are personal ones that may not be asserted vicariously. Drawing then on *Alderman v. United States,* 394 U.S. 165 (1969), the Court concluded that "[a] person who is aggrieved by an illegal search and seizure *only through the introduction of damaging evidence secured by a search of a third person's premises or property* has not had any of *his* Fourth Amendment rights infringed." (Emphasis supplied.) *Rakas, supra,* 439 U.S. at 134. The question was not really one of standing, said the Court, but rather of the "purview of substantive Fourth Amendment law. . . ." *Id.* at 140.

The essential departure from *Jones* made in *Rakas* was in the "legitimately on premises" standard announced in *Jones,* which the Court, in retrospect, felt was too broad. Instead, it adopted the criterion of *Katz v. United States,* 389 U.S. 347 (1967) — whether the person claiming the protection of the Fourth Amendment *"has a legitimate expectation of privacy in the invaded place."* (Emphasis supplied.) *Rakas, supra,* 439 U.S. at 143. In that connection, the Court stated, in a lengthy footnote (note 12, 439 U.S. at 143-44):

> "Obviously, however, a 'legitimate' expectation of privacy by definition means more than a subjective expectation of not being discovered. A burglar plying his trade in a summer cabin during the off season may have a thoroughly justified subjective expectation of privacy, but it is not one which the law recognizes as 'legitimate.' His presence, in the words of *Jones,* 362 U.S., at 267, is 'wrongful'; his expectation is not 'one that society is prepared to recognize as "reasonable." ' *Katz v. United States,* 389 U.S., at 361 (Harlan, J., concurring). And it would, of course, be merely tautological to fall back on the notion that those expectations of privacy which are legitimate depend primarily on cases deciding exclusionary-rule issues in criminal cases. Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment,

either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society. One of the main rights attaching to property is the right to exclude others, see W. Blackstone, Commentaries, Book 2, ch. 1, and one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude. Expectations of privacy protected by the Fourth Amendment, of course, need not be based on a common-law interest in real or personal property, or on the invasion of such an interest. These ideas were rejected both in *Jones, supra,* and *Katz, supra.* But by focusing on legitimate expectations of privacy in Fourth Amendment jurisprudence, the Court has not altogether abandoned use of property concepts in determining the presence or absence of the privacy interests protected by that Amendment. . . ."

If, as the footnote clearly implies, the law is not prepared to recognize as "legitimate" a burglar's subjective expectation of privacy in a home he has burglarized, is it ready to protect a thief's expectation of privacy in a moped or a backpack that he has stolen?

The considerations here are not so simple as they may appear at first glance. Even under *Rakas,* the precepts of civil property law, though highly relevant, are not necessarily controlling. The legitimacy of one's expectation of privacy is in large measure a function of its reasonableness, and that, in turn, is determined to some extent by the elements of time, place, and circumstance. There may well be situations, for example, in which the unlawfulness of an initial acquisition can become attenuated by other factors, such as the length of time the article is in the defendant's exclusive possession, or an honest, though mistaken, belief that the object in question actually belongs to him — that his acquisition of it was not unlawful.

We need not address, in this case, the ultimate parameters

of the issue, of what result would flow from a balancing of these factors in the extreme case. Here, we have no doubt. Whatever appellant's subjective expectation of privacy may have been, his interest in a moped or in a backpack (with most or all of its contents still in it) stolen the evening before, is simply not one that the Constitution ever intended to protect or that, viewed objectively from the perspective of public policy, should be protected.

This Court faced a similar issue in *Palmer v. State,* 14 Md. App. 159 (1972), where the defendant sought to suppress narcotics paraphernalia found in the stolen car he was driving at the time of his arrest. We concluded that "[n]o valuable social purpose could conceivably be served by extending the protection of the Fourth Amendment to a thief in the enjoyment of the stolen automobile." *Id.* at 169. Other jurisdictions, both before and after *Rakas,* have reached similar conclusions. *See, e.g., State v. Thomas,* 595 S.W.2d 325 (Mo. App. 1980); *Khaalis v. United States,* 408 A.2d 313 (D.C. 1979), *cert. den.* 444 U.S. 1092 (1980); *State v. Abordo,* 596 P.2d 773 (Hawaii 1979); *State v. Purcell,* 586 P.2d 441 (Utah 1978); *Mack v. State,* 380 N.E.2d 592 (Ind. App. 1978); *People v. Pearson,* 546 P.2d 1259 (Colo. 1976). Although a few courts have reached the opposite result, *e.g. Barr v. State,* 531 P.2d 1399 (Okla. Cr. App. 1975), *Cotton v. United States,* 371 F.2d 385 (9th Cir. 1967), it is significant that in *Rakas* the Supreme Court characterized such holdings as "inexplicable." *Rakas, supra,* 439 U.S. at 141, n. 9.

We therefore conclude that appellant was not deprived of any Constitutionally protected right by the search of the moped or the backpack — that, in pre-*Rakas* terms, he had no "standing" to object to either of these searches.[4] We further conclude that the other issues raised on appeal are without merit.

> *Judgments affirmed; appellant to*
> *pay the costs.*

---

[4]. Had we reached the merits of the search and seizure issues, we would have been guided, as to the moped, by *Conner v. State,* 34 Md. App. 124 (1976), and *State v. Sedacca,* 252 Md. 207 (1969), and, as to the backpack, by *Chimel v. California,* 395 U.S. 752 (1969), and *United States v. Garcia,* 605 F.2d 349 (7th Cir. 1979).