540 A.2d 143

**Robert Leslie BROWN**

v.

**STATE of Maryland.**

**No. 1222, Sept. Term, 1987.**

Court of Special Appeals of Maryland.

April 14, 1988.

Certiorari Denied June 27, 1988.

Mark Colvin, Asst. Public Defender (Alan H. Murrell, Public Defender, on the brief), Baltimore, for appellant.

Beverly Peyton Griffity, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Warren F. Sengstack, State's Atty. for Calvert County, Prince Frederick, on the brief), for appellee.

Argued before GILBERT, C.J., BISHOP, J., and W. ALBERT MENCHINE, Associate Judge of the Court of Special Appeals (retired), Specially Assigned.

BISHOP, Judge.

On June 10, 1987, a jury in the Circuit Court for Calvert County (Bowen, J.) convicted Robert Brown, appellant, of possession of a controlled dangerous substance, PCP, with the intent to distribute and simple possession pursuant to MD.ANN.CODE, art. 27 §§ 286 and 287, respectively. On August 25, 1987, the trial court merged the offenses and sentenced Brown to forty years,[1] twenty-six years suspended, for possession of PCP with the intent to distribute, and fined him $20,000.00.

Brown raises one issue:

Whether the trial court erred in failing to suppress the evidence.

## FACTS [2]

█ In early November, by way of a call from a confidential informant, Deputy Leslie Myers of the Calvert County Sheriff's Department was informed that Brown was a "heavy dealer in PCP" and that Brown was "dealing and processing PCP in his townhouse."[3] Although Deputy

---

1. This sentence was imposed on the basis of Art. 27, § 293 which provides that for a second or subsequent offense of the nature of the one involved in this case, the person may be punished by a term of imprisonment twice that otherwise authorized by law. The defendant was convicted under § 286 which in subsection (b)(1) provides for a twenty year sentence. In addition, although the sentencing transcript indicates that defendant's counsel acknowledged notice under § 293, we can find no evidence of such notice in the record; however, since this issue has not been raised or briefed, we will not address it.

2. When determining whether the denial of a motion to suppress was correct, an appellate court must look exclusively at the record made during the suppression hearing. *Trusty v. State,* 308 Md. 658, 670–72, 521 A.2d 749 (1987); *but cf.* Md. Rule 4–252(g)(2) (trial court may grant hearing *de novo* on renewal of motion to suppress).

3. Brown's residence was initially described as an "apartment" and later as a "townhouse". Based on our examination of photographs of

Myers observed the traffic in and out of Brown's townhouse for the next two nights, he was unable to verify the informant's tip because the traffic was insufficient to establish a pattern of drug dealing. Nevertheless, on November 19, 1986, Deputy Myers and two other Calvert County deputies made an unsuccessful attempt to purchase PCP from Brown at the townhouse.

On November 24, 1986, at approximately 11:30 p.m., Deputy Myers received another call from the confidential informant who told him that Brown had PCP in his townhouse and that he was "spraying or applying it to parsley flakes." Deputy Myers testified that information from the confidential informant had, on prior occasions, proven reliable. At approximately 12:00 midnight, another officer received an anonymous call from a "concerned citizen" who said that "a party of some type" was occurring in Brown's residence, that two white females were in the townhouse, that he was concerned about what was going on inside and that there was a possibility of illicit drug activity. Soon thereafter, Deputy Myers, Deputy Elliott and Sergeant Garner went to Brown's residence to investigate.

Because it is crucial to this appeal, we will describe in detail the area adjoining Brown's townhouse.[4] Brown lived in a community of two-story duplex townhouses.

When facing the front of Brown's townhouse, immediately to its left is a stockade type fence six feet high which extends out from the side of the townhouse approximately eight to ten feet. In this portion of the fence is a gate. The fence then continues about sixty feet, parallel to the side wall of the house, down a slight embankment, where it joins another section of the fence which runs parallel to the

---

the structure in the record (Def. ex. #1, 2 & 3) we will refer to his residence as a "townhouse".

4. The description is based on the testimony admitted during the suppression hearing and on the photographs admitted as defense exhibits. *See* note 2, *supra*

rear of the townhouse until it joins with a common fence dividing the back yards of the adjoining townhouses. This fence completely encloses the back yard of Brown's townhouse. Inside the enclosed area of Brown's back yard were a grill, a picnic table and a clothes line.

Deputy Myers testified that

[m]yself and Sgt. Garner went to the front door, and I began knocking on the front door and announced our presence. Deputy Elliott remained to the side of the apartment, and I again knocked on the door and announced my presence and requested somebody come to the door, we would like to speak to them. We could hear a lot of running inside the apartment, people running up and down the steps, a lot of commotion going on inside.

. . . . .

After about five (5) minutes or so of knocking, Deputy Elliott went to the rear of the residence, and I again announced ourselves as being the Sheriff's Department, and requested to speak to someone inside. At that time I heard a female state, "Robert, do you want me to let them in now." I couldn't hear the reply. So I again knocked and advised as we needed to speak to someone inside. They still would not open the door. So I then went to the rear of the apartment where Deputy Elliott was located.

Deputy Myers estimated that he knocked on Brown's front door for "a good eight minutes". Although Myers testified that he was unsure whether Brown's fence had a gate, (clearly, the photograph shows a gate) he unequivocally stated that "the side yard was open" and that "there was nothing stopping free access to the rear of the residence."

Deputy Elliott testified that

I was out front with Sgt. Garner and Deputy Myers initially. They knocked on the door, nobody came to the door. We then—I heard rustling inside so I went around

back to observe the back. Approximately ten (10) minutes went by and I heard a toilet—what I took to be a toilet, flush. I stood outside the window. I was on the left hand side—if you are facing the front of the house, I went around the left hand side of the house. * * * I went around and stood on the back left hand corner, approximately ten (10) feet out from the house. I observed a white male, ... raise the window [and] slit the screen with some object. I didn't see the object. [He] stuck his hand through the screen and threw a package or objects out. I couldn't see how many. I saw something leave his hand. There was light coming from the window that illuminated that I then went around the front of the house and got Deputy Myers. I showed him where approximately I heard the object land. We searched the area....

When asked why he initially went from the front of the house Elliott testified

Because I heard rustling in the house, and it sounded like everybody was running in the house. I went around back to insure our safety, more or less.

He also testified that he did not have to open any gates and that he "freely walked through" to the backyard.

With their flashlights, Deputies Myers and Elliott located the objects that had been thrown from the window. Deputy Myers testified that he picked up one of the objects and "[i]t was a small aluminum foil packet. I opened the packet up, and it had parsley flakes containing PCP". Deputy Elliott testified that based on his knowledge and experience he believed that the packets contained "[p]arsley flakes laced with PCP." Deputy Myers picked up another foil packet, opened it and noted that the packet "appeared to be very wet like it had been rinsed off...." Deputy Elliott testified that based on his knowledge and experience that one way of disposing of controlled dangerous substances, such as PCP, is to "[f]lush [the substance] down the commode." The

deputies recovered a total of nineteen foil packets. Both deputies returned to the front door area where Sergeant Garner and two other deputies, who had just arrived, were talking with Brown and two women.[5] At that time, the deputies neither searched Brown's residence nor arrested anyone.

Brown argues that the area enclosed by his stockade type fence is a "curtilage" entitled to Fourth Amendment[6] protection and that the deputies' warrantless search of the "curtilage" and subsequent seizure of the aluminum foil packets were unreasonable.

In determining whether Brown's Fourth Amendment rights were violated we will discuss the following sub-issues:

I. Whether Brown's yard is curtilage under the Fourth Amendment.

II. If it is curtilage, whether there was a warrantless "search" within the meaning of the Fourth Amendment.

III. If it is curtilage, whether Brown abandoned his property rights and privacy interests in the foil packets.

IV. If it is curtilage, whether the deputies' warrantless entry into Brown's back yard was a *per se* violation of the Fourth Amendment.

---

**5.** The two women were co-defendants Kimberly Pullen and Christine Hale. Those co-defendants were not tried with Brown and are not subjects of this appeal.

**6.** The Fourth Amendment states:
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized.
U.S. CONSTITUTION AMENDMENT IV. The Fourth Amendment has been made fully applicable to the States by the Fourteenth Amendment. *See Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

### I.

#### *The Curtilage*

 The Fourth Amendment protects a person's home from unreasonable searches and seizures. The Court in *United States v. Dunn,* 480 U.S. 294, 107 S.Ct. 1134, 1139 94 L.Ed.2d 326 (1987) stated that "the Fourth Amendment protects the curtilage of a house and that the extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself." The curtilage is defined as those areas near the residence which harbor the "intimate activity associated with the 'sanctity of a man's home and the privacies of life.'" *Oliver v. United States,* 466 U.S. 170, 180, 104 S.Ct. 1735, 1742, 80 L.Ed.2d 214 (1984) (quoting *Boyd v. United States,* 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886)).[7]

In *Dunn, supra,* the Court said,

we believe that curtilage questions should be resolved with particular reference to four factors: the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.

. . . . .

We do not suggest that combining these factors produces a finely tuned formula that, when mechanically applied, yields a "correct" answer to all extent-of-curtilage questions. Rather, these factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration— whether the area in question is so intimately tied to the

---

7. The extent of any particular curtilage may be different for purposes of the Fourth Amendment's protection than it would for purposes of determining whether a burglary occurred. This is so because the Supreme Court determines the law for constitutional purposes, *see Marbury v. Madison,* 5 U.S. 137, 1 Cranch 137, 2 L.Ed. 60 (1803), while the law of burglary normally depends on state law.

home itself that it should be placed under the home's "umbrella" of Fourth Amendment protection.

*Id.* 107 S.Ct. at 1139 (citations omitted).

■ The State argues that Brown's fully fenced back yard, where the foil packets were recovered, is not within the curtilage and is, therefore, not entitled to Fourth Amendment protection. *See Oliver v. United States,* 466 U.S. at 182–184, 104 S.Ct. at 1743–1744 (the Court held that evidence seized on the defendant's land, but outside of his curtilage, was evidence seized in "open fields" and therefore not a search within the meaning and protection of the Fourth Amendment). The State bases its argument that Brown's back yard is not curtilage on the fact the yard can be viewed by occupants of the adjoining duplex; thereby precluding any reasonable expectation of privacy in it. The State also argues that since nothing impeded either Deputy Myers' or Deputy Elliott's entry into the area, the yard lost any Fourth Amendment protection it might otherwise have provided Brown. We disagree.

In a footnote in *Dunn,* 107 S.Ct. at 1139 n. 4, the Court specifically rejected a "bright-line rule" proposed by the Government limiting the curtilage in all cases to the "nearest fence surrounding a fenced house." The Court rejected the rule because it would unduly restrict Fourth Amendment protection and still require courts to assess the four-factor test in cases where the area is not so nicely enclosed. *Id.* By doing so, the Court implicitly refused to hold that all fenced-in areas are cutilage but did state that "fencing configurations are important factors in defining the curtilage." Based on the four-factor test, *supra,* we hold that the enclosed area was within the curtilage. The placing of a stockade type fence in close proximity to the house, designed to keep out most onlookers, the apparent use of the yard for picnics, cookouts and laundry, leads us to this conclusion, regardless of whether the gate was open or closed. *See also California v. Ciraolo,* 476 U.S. 207, 217, 106 S.Ct. 1809, 1814, 90 L.Ed.2d 210 (1986) (a yard surrounded by high double fences and within close proximity to

the house was within the curtilage); *Everhart v. State,* 274 Md. 459, 485, 337 A.2d 100 (1975) ("a yard or lawn is considered within the protection of the curtilage and the mere absence of a physical barrier such as a fence, gate or hedge is not conclusive."); *and cf. Dunn,* 107 S.Ct. at 1140 (a barn fifty yards away and outside the nearest ranch style fence, not used for activities associated with the home and not protected from observation was not within the curtilage). *See also Sproates v. State,* 58 Md.App. 547, 473 A.2d 1289 (1984).

## II.

### *Was It A Search?*

■ The State argues that the deputies' warrantless entry into Brown's enclosed back yard was not a "search" within the meaning of the Fourth Amendment because the actions of the deputies were a reasonable response to Brown's failure to answer their persistent banging on the front door.

Professor LaFave, in his treatise *Search and Seizure* § 2.1(a) p. 301–302 (2nd ed. 1987), states:

Under the traditional approach, the term "search" is said to imply

some exploratory investigation, or an invasion and quest, a looking for or seeking out. The quest may be secret, intrusive, or accomplished by force, and it has been held that a search implies some sort of force, either actual or constructive, much or little. A search implies a prying into hidden places for that which is concealed and that the object searched for has been hidden or intentionally put out of the way. While it has been said that ordinarily searching is a function of sight, it is generally held that the mere looking at that which is open to view is not a "search". [quoting 79 C.J.S. *Searches & Seizures* § 1 (1952)]

Similar language is to be found in a great many appellate decisions.

The Supreme Court, quite understandably, has never managed to set out a comprehensive definition of the word "searches" as it is used in the Fourth Amendment. Many years ago the Court asserted that "a search ordinarily implies a quest by an officer of the law," but no one has ever suggested that every "act or instance of seeking" is a search in the Fourth Amendment sense. (Footnotes omitted).

Professor LaFave adds in § 2.3(f) p. 411–413:

Under the *Katz* [*v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)] approach, certain observations (albeit not into the residence or some other structure) made while the police are on adjoining lands are covered by the Fourth Amendment, while some others are not, depending upon whether there was an intrusion upon a justified expectation of privacy. In making that judgment, perhaps the most important consideration is precisely where on the adjacent lands the police were positioned. This is because a portion of the curtilage, being the normal route of access for anyone visiting the premises, is "only a semi-private area." As elaborated in *State v. Corbett* [, 15 Or.App. 470, 516 P.2d 487 (1973)].

People commonly have different expectations, whether considered or not, for the access areas of their premises than they do for more secluded areas. Thus, we do not place things of a private nature on our front porches that we may very well entrust to the seclusion of a backyard, patio or deck. In the course of urban life, we have come to expect various members of the public to enter upon such a driveway, e.g., brush salesmen, newspaper boys, postmen, Girl Scout cookie sellers, distressed motorists, neighbors, friends. Any one of them may be reasonably expected to report observations of criminal activity to the police * * *. If one has a reasonable expectation that various members of society may enter the property in their personal or business pursuits, he should find it equally likely that police will do so.

Thus, when the police come on to private property to conduct an investigation or for some other legitimate purpose and restrict their movements to places visitors could be expected to go (e.g. walkways, driveways, porches), observations made from such vantage points are not covered by the Fourth Amendment. But other portions of the lands adjoining the residence are protected, and thus if the police go upon these other portions and make observations there, this amounts to a Fourth Amendment search. (Footnotes omitted).

The foregoing discussion squarely presents the issue specifically left undecided in *Oliver*, 466 U.S. at 180 n. 11, 104 S.Ct. at 1742 n. 11: what is "the degree of Fourth Amendment protection afforded the curtilage, as opposed to the home itself." Analytically, the Court views the curtilage as an "exception to the open fields doctrine." *Id.* This means that areas within the curtilage and afforded Fourth Amendment protection may not be entered by police for any reason absent a warrant or proper exigent circumstances. Those areas outside the curtilage or within the curtilage but outside the protection of the Fourth Amendment are effectively, for purposes of the warrant requirement, "open fields".

In the case *sub judice*, the police initially went onto Brown's property to investigate the validity of the allegations made by the confidential informant and the "concerned citizen". It is proper for police to enter upon another's property for this purpose. *See e.g.* LaFave, *Searches and Seizure*, § 2.3(b) p. 387 ("It is not improper for a police officer to call at a particular house and seek admission for the purpose of investigating a complaint or conducting other official business.") and cases cited in § 2.3(F) p. 412, NN. 163 and 164. The front door area around Brown's house, although within the curtilage area as defined by the *Dunn* four-factor test, is entitled to extremely limited Fourth Amendment protection because Brown could not reasonably expect a great amount of privacy in an area where the public was welcome. *See* LaFave, *supra,* § 2.3(F) p. 412, NN. 165 and 167.

■ The more difficult and more relevant question is whether the area in which the foil packets were found should, under the circumstances, be afforded Fourth Amendment protection. We think it should and hold that the deputies' actions constituted a "search". Deputy Elliott testified that he "freely walked through to Brown's backyard after Deputy Myers had knocked on the front door for eight minutes and in order to insure our safety". He did not "search" the backyard area in the literal sense of looking for something, but, rather, Deputy Elliott waited, in the dark and close to the house, until he observed Brown at the window.

Nevertheless, the entry into Brown's curtilage was a trespass, *Beale v. State,* 230 Md. 182, 184–85, 186 A.2d 213 (1962), into an area protected by the Fourth Amendment, and the entry may not be legitimated on the grounds advanced by the State. The back yard was clearly enclosed by a stockade type fence, evidencing an expectation of privacy. We hold that the entry into Brown's curtilage was a trespass which, absent a valid warrant or proper exigent circumstances, violated the Fourth Amendment as an unreasonable search.

Courts in other jurisdictions have also held that entries into areas of the curtilage not open to the public, such as in the case *sub judice,* are violations of the Fourth Amendment absent a valid warrant or proper exigent circumstances. *People v. Pakula,* 89 Ill.App.3d 789, 44 Ill. Dec. 919, 921–923, 411 N.E.2d 1385, 1387–1389 (1980); *Morsman v. State,* 360 So.2d 137, 138 (Fla.App.1978) *cert. discharged,* 394 So.2d 408 (Fla.1981) cert. denied 452 U.S. 930, 101 S.Ct. 3066, 69 L.Ed.2d 431 and *State v. Johnson,* 301 N.W.2d 625, 627–628 (N.D.1981).

### III.

#### *Abandonment*

The State argues that Brown abandoned his Fourth Amendment property interest in the foil packets by throwing them into his back yard. We disagree.

■ As a matter of general principle, a person may relinquish any Fourth Amendment property rights or expectation of privacy he or she may have in a place or object by "abandoning" that place or object. *Hester v. United States,* 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924). In *Duncan and Smith v. State,* 281 Md. 247, 265, 378 A.2d 1108 (1977), the Court, *quoting United States v. Colbert,* 474 F.2d. 174, 176 (5th Cir.1973), announced the test for abandonment:

> Abandonment is primarily a question of intent, and intent may be inferred from words spoken, acts done, and other objective facts.... All relevant circumstances existing at the time of the alleged abandonment should be considered.... Police pursuit or the existence of a police investigation does not of itself render abandonment involuntary.... The issue is not abandonment in the strict property-right sense, but whether the person prejudiced by the search had voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search. (citations omitted).

The foil packets were recovered within Brown's curtilage which is, by definition, an area in which he had asserted a reasonable legitimate expectation of privacy. *See Dunn* and *Oliver, supra; Salzman v. State,* 49 Md.App. 25, 53, 430 A.2d 847 (1981), *cert. denied,* 291 Md. 771, 772, 781 (1981). We have a conceptual difficulty in accepting the State's argument that Brown "abandoned" his property, no matter how bizarre his behavior may have been, when the property alleged to have been abandoned remained physically located in an area where he not only retained dominion but also had a reasonable expectation of privacy.

In *Everhart v. State,* 274 Md. at 483–84, 337 A.2d 100 (1975), the Court of Appeals, in discussing the application of the abandonment doctrine, said:

> In *Abel v. United States,* 362 U.S. 217 [80 S.Ct. 683, 4 L.Ed.2d 668] (1960), evidence seized from a wastebasket

in a hotel room after the petitioner had vacated the room was found to "have been abandoned." In *Henderson v. Warden,* 237 Md. 519, 206 A.2d 793 (1965) (where the defendant, while being chased by the police, threw a packet of narcotics into a churchyard), and in *Matthews v. State,* 237 Md. 384, 206 A.2d 714 (1965) (where the defendant, again while being chased by the police, threw three brown envelopes which contained incriminating evidence under an automobile parked on a public street), the jettisoned materials were in each case held to have been "abandoned." *See also Hester v. United States,* 265 U.S. 57 [44 S.Ct. 445, 68 L.Ed. 898] (1924) (where the defendant, being pursued by revenue officers, in an open field, dropped the jug of whiskey which he was "toting"). However, in *Work v. United States,* 243 F.2d 660 (D.C. Cir.1957), the placing of a phial under the porch of a house was held to have been a concealment upon protected premises and not an abandonment, and in *Hobson v. United States,* 226 F.2d 890 (8th Cir.1955), cited with approval and followed by this Court in *Beale v. State,* [230 Md. 182, 186 A.2d 213 (1962)], *the discard of a package of narcotics into the backyard* (a part of the curtilage) *of a dwelling house was held not to be an abandonment.* (Emphasis added).

We hold that under the facts of the case *sub judice,* there was no abandonment.

## IV.

### *The Entry*

Assuming, *arguendo,* that a "search" occurred, Brown argues that the warrantless entry into his curtilage violated his Fourth Amendment right to be free from an unreasonable search and seizure. He relies heavily on *Beale v. State,* 230 Md. 182, 186 A.2d 213 (1962) and *Hobson v. United States,* 226 F.2d 890 (8th Cir.1955). We agree.

In *Beale,* three police officers went without a warrant to the defendant's residence to speak to her about a prior arrest. One officer went to the rear of the premises, while another rang the front door bell of the building in which the defendant's apartment was located. The defendant did not respond. When the officer in the rear observed the defendant throw drug paraphernalia into the "hedge-enclosed backyard", he communicated his observation to the officer at the front door who then kicked in the front door and went to the apartment of the defendant. *Beale,* 230 Md. at 184, 186 A.2d 213. The Court said, "it is apparent to us that the police were trespassers at the time the narcotics equipment was picked up in the backyard. Officer Davis became a trespasser the moment he entered the enclosed backyard." *Id.* at 184–185, 186 A.2d 213. The Court held that "the seizure of the narcotics equipment by the police was clearly illegal ... [a]nd, inasmuch as at least one of the police officers was an intruder when the equipment was picked up in the backyard without a search warrant, it is evident that the unauthorized seizure was unreasonable." *Id.* at 187, 186 A.2d 213.

In *Hobson,* without a warrant, three officers, went to the defendant's home to arrest the defendant's wife. Two officers went to the front door while another officer entered the fence-enclosed back yard. The two officers at the front knocked and identified themselves, but, at first, neither the defendant nor his wife opened the door. The wife later appeared at the door clad in a slip and asked for time to get dressed. The defendant then threw a bag of heroin into the enclosed backyard. The officer in the rear conveyed that fact to the officers in the front who then burst into the house and arrested the defendant. *Hobson,* 226 F.2d at 891. The Court held that introduction of the heroin as evidence should have been suppressed because "[t]he enclosed backyard in which the thrown package landed was part of the curtilage of the defendant's home and was subject to the same protection as the home itself." *Id.* at 894–895 (citations omitted). We hold that *Beale* is disposi-

tive. Our holding is consistent with *Beale* and *Hobson* where the police "forced" the action of the respective defendants. Although the police did not make a physical intrusion into Brown's townhouse, as they did in *Beale* and *Hobson*, the persistent knocking by the deputies for a "good eight minutes" or more constituted sufficient "force" to make this case analogous with *Beale* and *Hobson*.

We do not read *Oliver*, as the State would have us read it, to hold or imply that a trespass is never a consideration on the issue of whether there has been a Fourth Amendment violation. Rather, we read *Oliver* as stating that the law of trespass is a consideration, although not dispositive, on the issue of whether there has been a violation of the Fourth Amendment.

JUDGMENT REVERSED; CASE REMANDED FOR A NEW TRIAL;

COSTS TO BE PAID BY CALVERT COUNTY.