589 A.2d 1330

**Leonard E. JOYNER and Keith Watson**

v.

**STATE of Maryland.**

**No. 1181, Sept. Term, 1990.**

Court of Special Appeals of Maryland.

May 16, 1991.

Stephen R. Tully (Seigel, Tully, & Furrer, on the brief), Baltimore, for appellants.

Thomas K. Clancy, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., and Stuart O. Simms, State's Atty., for Baltimore City on the brief), Baltimore, for appellee.

Submitted before WILNER, C.J., and ALPERT and DAVIS, JJ.

ALPERT, Judge.

On April 28, 1989, police officers arrested Keith Watson and Leonard Joyner (appellants), at Joyner's residence, for drug law violations. Appellants subsequently were charged with possession of cocaine with intent to distribute. On June 7, 1990, the Circuit Court for Baltimore City held a hearing on appellants' motions to suppress the evidence. The court denied the motions.

Appellants entered a plea of not guilty at the court trial (the Hon. John C. Themelis, presiding) on June 11, 1990. At the conclusion of the trial, the court found appellants guilty as charged. The court sentenced Watson to eight years imprisonment, with four years suspended and five years supervised probation. Joyner received a five-year suspended sentence with five years of probation.

On appeal, appellants ask us whether:

    I.   Keith Watson has standing to move for the suppression of evidence that police officers seized during a search of Joyner's backyard.

   II.   The police officers' warrantless entry into the back yard to seize the paper bag, absent exigent circumstances, violated appellants' Fourth Amendment rights.

  III.   The search and seizure warrant for the house should be considered the "fruit of the poisonous tree" because the warrant was based on probable cause derived from an illegal search and seizure of the paper bag.

## FACTS

At 4:10 p.m. on April 28, 1990, four plain clothes police officers—Officers Snow, Sewell, Moore, and Bevilacqua—were on patrol in the 1200 block of North Dallas Street, which encompasses the alley for the 1500 block of Preston

Street.[1]  Although the officers were travelling in an un-marked blue Chevrolet Cavalier, the vehicle was recogniz-able to neighborhood residents as one operated by the Eastern District Drug Enforcement Unit.  The officers were in the area in response to anonymous telephone calls that concerned neighborhood residents had made to the Eastern District the day before to report drug-related activi-ties which were occurring in the neighborhood.  The callers reported that individuals were stashing and selling drugs in a back alley located in the 1500 block of Preston Street.  Specifically, they stated that individuals were hiding the drugs in a pigeon coop and in abandoned vehicles.  These callers further stated that "they wanted the area cleaned up."

While driving in the alley, Officer Snow observed Keith Watson standing in the alley with his hand over the four-foot high chain-link fence that surrounds the back yard of 1505 East Preston Street.  A large pigeon coop with pi-geons and a clothes line were visible in the yard.  At the same time, the officers also observed Theodore Johnson, who was standing inside the yard and was in the act of handing a "balled up" brown paper bag to Watson.  The officers did not recognize the men as criminals or drug offenders.

The officers exited their car and began to approach Watson and Johnson.  Although the officers prominently displayed their badges, they did not draw their guns or verbally communicate with the men.  Johnson dropped the bag among the trash lying in the yard, turned, and ran into the house when he saw the officers [2]—apparently after they

---

1.  The 1500 block of Preston Street is a "drug-free zone."  Under the drug-free zone laws, Baltimore City identifies those areas with the greatest number of drug-related arrests and designates them "drug-free zones" by posting signs.  The purpose of these laws is to prevent people from loitering in heavily congested areas where they might have the opportunity to buy or sell drugs.

2.  At the hearing on the motions to suppress, Johnson testified that he did not see the police car pull up.  He testified that he just dropped

had exited their car. Watson saw the officers when he turned around but remained where he was. One of the officers left to cover the front exit of the house.

Officer Snow was standing next to Watson at this point. Based on the anonymous tips, his observations of the men's activities, and his knowledge of narcotics activities, Snow concluded that the men had been engaged in a drug transaction and detained Watson.

With the help of another officer, Snow lifted the chain link fence and reached into the yard to retrieve the brown paper bag. Although Snow could not know what the bag's contents were before he actually opened it and looked inside, he considered the paper bag to be significant because of his expertise in narcotics activities. Normally, the bag would have been the size of a lunch bag but was "all crinkled up, balled up into a ball." At the hearing on the motions to suppress, Snow testified that individuals in that area commonly used similar bags to hide and transport drugs.[3] The bag was designed to look like "another piece of trash that can just be laid in the gutter or anywhere and no one actually has to hold the drugs on them[selves]." Individuals used the bags to keep the drugs outside so that they could avoid suspicion by not having to make numerous trips in and out of the stash house.

When he opened the bag, Snow found seven vials containing what he suspected to be (and what later was determined to be) cocaine. Snow postulated that if Watson merely had been a user, Johnson simply would have given him the vials containing the drugs, not the paper bag. Further, someone buying for personal use would purchase only one to three vials at one time, never seven. From this, Snow concluded that Johnson supplied drugs from the stash house and that

---

the bag and ran into the house. He also testified that he lived at 1505 East Preston Street, was staying there with Joyner, and that he owned the pigeon coop and the brown bag.

**3.** Officer Snow estimated that approximately 20 percent of the drugs in that area were stored in brown paper bags.

Watson was a "runner"—a person who delivers drugs to users on the street. The officers arrested Watson at this point.

Snow climbed over the fence, went to the back door of the house, and knocked. When Craig Phillips answered, Snow identified himself, entered with the other officers, and secured the house. That is, the officers made a protective sweep of the premises, locating everyone in the house and placing them in the first floor front room. The officers found appellant Leonard Joyner on the steps between the second and third floors. Because he eventually concluded that Joyner controlled the drugs in the house in Johnson's absence, Snow later arrested Joyner. During the sweep, Snow observed narcotics-related items in the house.[4] The officers did not search further after they secured the house. Snow then left and obtained a search warrant. Execution of the search warrant resulted in the seizure of a substantial quantity of cocaine in plastic vials in addition to drug paraphernalia.

## I.

Watson contends that he has standing to move for the suppression of the evidence which led to his arrest that the officers found when they removed the brown paper bag from the backyard at 1505 East Preston Street.

A defendant who moves to suppress the evidence must demonstrate that he or she has standing, *i.e.,* that he or she "has a lawful right under the Constitution to contest the search and seizure." *McMillian v. State,* 65 Md.App. 21, 31, 499 A.2d 192 (1985). To establish standing, the defendant must show that under the "totality of the circumstances" he or she had a " 'legitimate expectation of privacy in the area invaded at the time of the search.' " *Id.* (citation omitted). Whether one's expectation of privacy is legitimate is in " 'large measure a function of its reasonable-

---

**4.** Snow observed some empty vials sitting on the kitchen table.

ness, and that, in turn, is determined to some extent by the elements of time, place, and circumstance.'" *Id.* (citing *Graham v. State,* 47 Md.App. 287 at 294, 421 A.2d 1385). Those elements of time, place, and circumstance that we have considered in the past include:

> the appellant's possessory interest in the premises; appellant's right to and duration of stay at the searched premises; whether or not he had unlimited access to the searched premises; whether appellant had a right to exclude others from access to the searched area; what precautions he took to maintain his privacy there; appellant's subjective expectation of privacy in the area searched; the location of the property at the time of the search; [and] ownership of the evidence seized...."

*McMillian,* 65 Md.App. at 32–33, 499 A.2d 192 (citations omitted).

The circuit court's ruling on the standing issue is subject to the clearly erroneous standard of review. *See Coomes v. State,* 74 Md.App. 377, 391, 537 A.2d 1208, *cert. denied,* 313 Md. 8, 542 A.2d 845 (1988). In determining the propriety of the lower court's ruling, we "must look to the record of the suppression hearing and not to the evidence presented at trial." *McMillian,* 65 Md.App. at 33, 499 A.2d 192; *see also Gamble v. State,* 318 Md. 120, 125, 567 A.2d 95 (1989).

Watson argues that he has standing because "it was his own back yard being searched" and because he was "a member of the household." Johnson's testimony at the suppression hearing established that Watson did, in fact, reside at the premises. The police, however, searched the inside of the paper bag, not the yard itself. On this basis, we find that Watson did not have standing because Johnson was the owner of the bag.

Watson also contends that even if the actual area searched was the inside of the paper bag rather than the backyard, he still has standing. He reasons that he has "an obvious possessory interest" because the State charged him

as "an equal member in the possession of the cocaine to be distributed."

Watson essentially makes an argument for "automatic standing," *see Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), a concept that Maryland has never adopted, *see Gahan v. State,* 290 Md. 310, 311, 430 A.2d 49 (1981), and which most other states have discarded. *See* 4 W. LaFave, *Search and Seizure* § 11.3(g), at 350 n. 314 (1987). The record shows that Johnson dropped the bag in the backyard before Watson had the chance to take it. Thus, Watson never had physical possession of the bag— not even for a moment. Further, we note that Watson never asserted a possessory (ownership) interest in the bag either at the time of the seizure or at the evidentiary hearing. Watson cannot now claim a possessory interest in the bag based solely on the possession charges and conviction.

Furthermore, we note that even if we did find that Watson had standing, that ruling would not improve his position because we shall hold that the area in which Johnson dropped the bag was not curtilage.

We hold that the circuit court was not clearly erroneous when it concluded that Watson did not have standing to challenge the search and seizure of the bag.

## II.

Appellants contend that the removal of the paper bag from the backyard constituted a warrantless search and seizure that violated the Fourth Amendment's protections against such state actions. They argue that because appellant's backyard was curtilage, the area was within the protective ambit of the Fourth Amendment. Thus, reason appellants, the officers' invasion of the backyard by forcibly moving the fence and taking the bag was an improper search and seizure. They further assert that the warrantless search of the appellants' curtilage was not excused as the paper bag had not been abandoned.

The State, however, contends that because the officers had probable cause to believe that they had witnessed a crime, the warrantless search and seizure was valid as a search incident to Watson's arrest. The State further argues that the search was constitutionally permissible because (1) the yard was not curtilage, and (2) even if the yard was curtilage, Johnson had abandoned the paper bag and therefore had no reasonable expectation of privacy in it. We think that the officers' warrantless search and seizure of the paper bag was valid as a search incident to Watson's arrest so long as the officers had probable cause to make the arrest.

### Probable Cause

"[T]he right of arrest arises only when a crime is committed or attempted in the presence of the arresting officer or when the officer has 'reasonable grounds to believe'—sometimes stated 'probable cause to believe'—that a felony has been committed by the person to be arrested." 1 W. LaFave, *Search and Seizure* § 3.1(b), at 545 (1987); *see also State v. Doe*, 371 A.2d 167, 169, 371 A.2d 167 (1975) ("Probable cause to arrest exists where the facts and circumstances within the officer's knowledge or of which he has reasonably trustworthy information would warrant a man of ordinary caution in the belief that the arrestee has committed or is committing a crime."); *Wynn v. State*, 69 Md.App. 536, 540, 518 A.2d 1072 (1987), *rev'd on other grounds*, 313 Md. 533, 546 A.2d 465 (1988) (" '[A]n officer who initiates an arrest must have ... probable cause to believe that a crime has been or is about to be committed, and that the suspect is involved in the crime.' " (citation omitted)).

There is ample evidence in the suppression hearing record to support the conclusion that the officers had probable cause to believe that they were witnessing a crime in progress.

When the officers entered the alley and observed the two men, the officers already were armed with information

from citizens' reports made the previous day. The callers had reported that individuals were storing and selling drugs in a back alley 'of the 1500 block of Preston Street. Further, the callers specifically had mentioned that individuals were storing the drugs in a pigeon coop. Thus, the presence of the coop in the backyard of 1505 East Preston Street tended to corroborate the reports and focused the officers' attention on the two men.

The officers observed Johnson in the process of handing Watson a crumpled paper bag. These facts, combined with the officers' expertise in narcotics, further corroborated the reports. Officer Snow's testimony at the suppression hearing established that he immediately recognized the significance of the crumpled bag. The bags were designed to look like "another piece of trash that can just be laid in the gutter or anywhere and no one actually has to hold the drugs on them." Snow knew that individuals in that area commonly used the bags to transport and to hide drugs.

The officers also knew that the city had designated the area a drug-free zone because of the high incidence of drug-related activities taking place there. In *Timms v. State,* 83 Md.App. 12, 14 n. 1, 573 A.2d 397 (1990), Judge Robert M. Bell explained the significance of the drug-free zone laws.

> Pursuant to Baltimore City Ordinance No. 375, effective July 11, 1989 it is unlawful for a person to loiter in a public place in order to engage in drug-related crimes. In determining whether such a crime is in progress, police are to consider the totality of the circumstances, one of which, by way of example, is fleeing, without any apparent reason, upon an officer's arrival."

As the officers exited the car and began to approach the two men, Johnson apparently spotted them. He at once dropped the bag among the other trash that was in the yard, turned, and ran into the house.

We note that the officers were in a public alley where they had every right to be. There was no "display of

authority" when the officers approached the two men. The officers' car was unmarked (although recognizable to area residents as a drug enforcement vehicle), and the officers were in street clothes with their guns holstered. Further, the officers gave no verbal commands. Thus, the fact that Johnson dropped the bag and fled when the officers approached was a further indication that the men were committing a crime. *See Hunt v. State,* 312 Md. 494, 508, 540 A.2d 1125 (1988). Under the totality of the circumstances, we think that the police officers had probable cause to believe that the men were engaged in a drug transaction, and, thus, probable cause to arrest Watson.

We already have established that Watson did not have standing to object to the search of the bag. Because the State did not challenge below Joyner's standing to object to the search of the bag, we must determine the lawfulness of the search and seizure of the bag with respect to Joyner.

### Search Incident to Arrest

■ Officer Snow detained Watson before retrieving the bag and opening it. That Officer Snow did not formally arrest Watson until after the officers retrieved the paper bag and searched it is not significant because the officers had probable cause to make the arrest at the time of the search. *Rawlings v. Kentucky,* 448 U.S. 98, 111, 100 S.Ct. 2556, 2564, 65 L.Ed.2d 633 (1980); *Anderson v. State,* 78 Md.App. 471, 480–83, 553 A.2d 1296 (1989). It is enough that the two events essentially were contemporaneous. *Lee v. State,* 311 Md. 642, 668, 537 A.2d 235 (1988).

■ When an officer makes a lawful arrest, the officer may search for and seize any evidence on the arrested person to prevent concealment or destruction. *Chimel v. California,* 395 U.S. 752, 762–63, 89 S.Ct. 2034, 2039–40, 23 L.Ed.2d 685 (1969). The officer also may search the area within the suspect's immediate control to remove any weapons that he might try to use and to prevent the concealment or destruction of evidence. *Id.* In *Lee,* the Court of

Appeals explained that "the area of immediate control under *Chimel* is determined by the potentiality for harm and not by actual, physical control by the arrestee at the time the search is conducted." *Id.* 311 Md. at 670, 537 A.2d 235. The court in that case upheld an officer's search of a gym bag estimated to be anywhere from several to eight feet away from the suspects and that took place after the police already had seized the suspects. *Id.* at 667–72, 537 A.2d 235. The court reached a similar result in *Foster v. State,* 297 Md. 191, 217–220, 464 A.2d 986 (1983), *cert. denied,* 478 U.S. 1010, 106 S.Ct. 3310, 92 L.Ed.2d 723 (1986), in which it upheld an officer's search of a nightstand drawer that was two feet away from the suspect even though the police already had handcuffed her hands behind her back.

▮ In this case, the bag was located just inside the chain-link fence. We think the fact that the police were able to retrieve it by reaching under the fence and into the yard placed it in the area of Watson's immediate control. Consequently, we hold that the officers lawfully searched the bag as an incident to Watson's arrest.

Even if we did not hold that this was a lawful search incident to Watson's arrest, appellant would not prevail in this issue because we do not believe that the backyard was curtilage within the meaning of the Fourth Amendment.

### *Curtilage*

▮ The Fourth Amendment protects people's homes from unreasonable searches and seizures. U.S. Const. amend. IV.

> [T]he Fourth Amendment [also] protects the curtilage of a house and ... the extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself.

*United States v. Dunn,* 480 U.S. 294, 300, 107 S.Ct. 1134, 1139, 94 L.Ed.2d 326, *reh'g denied,* 481 U.S. 1024, 107 S.Ct. 1913, 95 L.Ed.2d 519 (1987).

In *Dunn,* the Supreme Court set forth those factors which courts should use to resolve curtilage questions:

the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.

*Id.* at 301, 107 S.Ct. at 1139; *see also Brown v. State,* 75 Md.App. 22, 30, 540 A.2d 143 (1988). The Court further noted that the factors were not a "finely tuned formula." *Dunn,* 480 U.S. at 301, 107 S.Ct. at 1139. Rather, they were useful only to the extent that they bore to the primary consideration of "whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id.* In *Horton v. United States,* 541 A.2d 604, 608 (D.C. App.1988), the court cautioned that "as to cases concerning homes in the city, the factors in *Dunn* must be evaluated with reference to the obvious attributes of an urban environment."

Proximity to the home, for example, may be virtually irrelevant if the area surrounding the home is quite small. Likewise, the absence of a fence or other means of excluding passersby from the area may be less significant in an urban than in a rural area, since the configuration of the streets and houses in many parts of the city may make it impossible, or at least highly impracticable, to screen one's home and yard from view.[ ] In any event, in an urban area, substantial weight may have to be accorded the uses to which one's real estate is put, for actual use of the yard and related property is likely to be the primary way in which one asserts an intimate tie to the home.

*Id.* at 608–09.

In this case, the area at issue is the backyard of the 1505 East Preston Street residence. A four-foot high chain-link fence completely encloses this part of the property and a locked gate controls access to the yard. The coop in which

Johnson kept his pigeons as well as a clothes line for hanging laundry were situated in the yard. In addition to using the yard for these "intimate activit[ies] associated with the sanctity of a man's home and the privacies of life," *Brown v. State*, 75 Md.App. 22, 30, 540 A.2d 143 (1988) (citations omitted), the residents apparently also used the yard to conduct business (drug) transactions. Finally, we note that the area was entirely open to observation and that Johnson exposed to the public the illicit activity which he was conducting with Watson.

Although the trial court in the instant case did not expressly address the curtilage question, we think a finding that the yard was not curtilage was implicit in its holding. The Supreme Court has cautioned that "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967); *see also United States v. Santana*, 427 U.S. 38, 42, 96 S.Ct. 2406, 2409, 49 L.Ed.2d 300 (1976). We believe a finding that the area was curtilage, *i.e.,* that the residents used it for the intimate activities associated with home and private life, would be incongruous because the residents also used the area for illegal public business transactions. Under the circumstances of this case, we hold that the back yard was not curtilage within the meaning of the Fourth Amendment. The only remaining question then is whether Johnson abandoned the paper bag when he dropped it to the ground.

### Abandonment

■ Appellants argue that Johnson's relinquishment of control over the bag did not automatically force Johnson to give up his expectation of privacy, thus apparently assuming that Johnson's expectation of privacy inured to the benefit of Joyner, a co-tenant. In *Duncan and Smith v. State*, 281 Md. 247, 262, 378 A.2d 1108 (1977), the Court of Appeals indicated that "one who abandons property thereby surrenders any expectation of privacy therein, [and] re-

moves himself from the protection of the Fourth Amendment...." The test for abandonment is "not whether all formal property rights have been relinquished, but whether the complaining party retains a reasonable expectation of privacy in the articles alleged to be abandoned." *Id.* " '[W]hether property is abandoned is generally a question of fact based upon evidence of a combination of act and intent.' " *Id.* (citation omitted). There are limits to the abandonment doctrine, however. *Id.* at 263, 378 A.2d 1108. The doctrine will not apply if the abandonment was the result of unlawful police action. *Id.*

In this case, the trial court found that Johnson intended to relinquish control of the bag when he dropped it to the ground. Further, he did so voluntarily and not as the result of any unlawful police action. On these facts, we think that Johnson relinquished any reasonable expectation of privacy in the bag when he dropped it to the ground and ran into the house. Assuming, arguendo, that Joyner did indeed share, with Johnson, an expectation of privacy in the bag, that expectation was lost when Johnson abandoned the bag.

Because we already have held that the yard was not curtilage for Fourth Amendment purposes, we need not address the question of whether an individual may abandon property in an area in which he has an expectation of privacy. *See Brown v. State,* 75 Md.App. 22, 36, 540 A.2d 143 (1988). We note, however, that other courts have so held. *See, e.g., People v. Ortega,* 175 Colo. 136, 485 P.2d 894, 895 (1971) (defendant abandoned drugs when he dropped them in backyard of his apartment complex as police approached him for questioning); *see also* Annotation, *Search and Seizure: What Constitutes Abandonment of Personal Property Within Rule That Search and Seizure of Abandoned Property Is Not Unreasonable— Modern Cases,* 40 A.L.R. 4th 381, 424–25 (1985).

## III.

Appellants contend that the evidence which the officers discovered during their warranted search of the house was

the fruit of the poisonous tree and therefore inadmissible. Appellants argue that the only basis for probable cause which the officers gave in the affidavit for the search warrant was the contraband that they discovered in the brown paper bag. Appellants reason that because the initial search and seizure of the bag was illegal, all that subsequently flowed from that illegality also was tainted.

We already have established that the officers' search and seizure of the bag was lawful. Therefore, we need not address this argument further.

JUDGMENTS AFFIRMED; APPELLANTS TO PAY THE COSTS.