765 A.2d 629

**STATE of Maryland**

v.

**Donna L. SAMPSON.**

**No. 17, Sept. Term, 2000.**

Court of Appeals of Maryland.

Jan. 16, 2001.

Gary E. Bair, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Md., on brief), Baltimore, for petitioner.

Stephen Z. Meehan (David C. Wright and Joseph B. Tetrault of Wright & Meehan, on brief), Chestertown, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY,* RAKER, WILNER, CATHELL and HARRELL, JJ.

---

* Rodowsky, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled

WILNER, Judge.

▮ Respondent was convicted in the Circuit Court for Dorchester County of possession of cocaine and maintaining a common nuisance. Those convictions rested in large part on evidence seized from her home pursuant to a search warrant. The probable cause for the warrant, in turn, was based principally on evidence taken by the police from trash bags that Respondent left out for collection by the municipal trash collector. The issue is whether the seizure of the trash bags and their contents violated respondent's rights under the Fourth Amendment and, as a result, fatally tainted the warrant, thereby making the evidence seized pursuant to it inadmissible. The Court of Special Appeals resolved that issue in respondent's favor and reversed her convictions. *Sampson v. State,* 130 Md.App. 79, 744 A.2d 588 (2000). We disagree and shall reverse the judgment of the Court of Special Appeals.

## BACKGROUND

The Cambridge City police became suspicious of respondent when an area merchant reported to them that respondent had engaged the merchant to repair her car and had paid for the repairs with more than $3,000 in cash. Finding that to be unusual, the merchant took the cash to the police station, where an officer had the money scanned by a K–9 unit dog for the presence of controlled dangerous substances. The dog made a positive alert, following which Officer Lewis ascertained the identity and address of respondent and learned that she (1) had been convicted previously of possession and possession with intent to distribute cocaine, and (2) was living with a man who at least one citizen in the community informed the police was a major cocaine dealer.

With that information, Officer Lewis began looking for evidence by searching through respondent's trash.[1] He

---

pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

1. Throughout the opinion, we shall use the words "trash" and "garbage" interchangeably.

learned that the trash was routinely collected from respondent's home on Monday and Thursday mornings. On six successive trash collection days, either Officer Lewis or Officer Bromwell drove to the block where respondent lived just before the trash collector was due to arrive, picked up the trash bag(s) set out by her for collection, and took them to the police station, where they were opened and searched. The trash bags were opaque, made of white or green plastic and tied at the top. Among other things found in the bags were clear plastic baggies, with the bottom corners cut out, that contained traces of cocaine.

Respondent's home has a rather shallow front yard that leads to a municipal sidewalk, on the far side of which are the curb and the public street. In the yard near the sidewalk is a tree, and the trash bags were left in front of the tree, about two to three feet from the sidewalk. Standing on the sidewalk, the officer simply reached over the two to three feet of lawn and picked up the bag(s) without stepping on the lawn itself.

Respondent claimed at the suppression hearing that she had a "No Trespassing" sign posted prominently in her front window. The two officers testified that the sign was not present during the month-long period that they picked up the trash but was put up later. The trial judge credited the officers' testimony.

## DISCUSSION

Whether it is permissible for the police, either directly or through prior arrangements with a trash collector, to seize and search through trash routinely set out by persons for collection has been the subject of considerable discussion in both court opinions and academic commentary. The basic principles guiding the discussion, at least since 1988, are found in *California v. Greenwood*, 486 U.S. 35, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988), in which the Court held that the police do not intrude upon Fourth Amendment rights when, through a prior arrangement with the regular trash collector, they obtain, open, and search through trash containers set out on the

curb "outside the curtilage of a home" for collection. The debate in the courts has been whether that holding is limited to those circumstances, or whether it also embraces the situation that we have here, where the resident places the trash container within the curtilage of the property and the police take the trash directly from the property, rather than from the trash collector.[2] Most of the courts have not found those differences to be significant; nor do we.

The touchstone of the Fourth Amendment analysis is *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576

2. The State notes in its brief that the issue of whether the trash bags were, in fact, left within the curtilage of the home was not litigated at the suppression hearing, and it suggests that "it is not at all clear" that such was the case. We shall assume, for purposes of this case, that the bags were left within the curtilage. The record contains pictures of the front lawn, showing the location of the tree and its close proximity to both the house and the sidewalk. In *United States v. Dunn*, 480 U.S. 294, 300, 107 S.Ct. 1134, 1139, 94 L.Ed.2d 326, 334 (1987), the Court noted that the curtilage concept originated at common law to afford the immediate area surrounding a dwelling house the same protection as the burglary law afforded the house itself, but that the concept also has Fourth Amendment significance. In *Oliver v. United States*, 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984), the Court held that the extent of the curtilage, for Fourth Amendment purposes, was to be determined "by reference to the factors that determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private," *id.* at 180, 104 S.Ct. at 1742, 80 L.Ed.2d at 225, and in *Dunn*, it held that curtilage questions "should be resolved with particular reference to four factors: the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *Dunn, supra*, 480 U.S. at 301, 107 S.Ct. at 1139, 94 L.Ed.2d at 334–35. The Court also made clear, however, that those factors could not be combined in mechanical fashion to produce a finely-tuned "correct" answer to all Fourth Amendment curtilage questions, but simply were "useful analytical tools" bearing "upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id.* See also *Everhart v. State*, 274 Md. 459, 485–86, 337 A.2d 100, 115 (1975), decided prior to *Oliver* and *Dunn*. In the *Dunn* case itself, the Court held that a barn on a 198–acre ranch, located inside a perimeter fence but 50 yards outside the fence surrounding the ranch house, was not within the curtilage of the house. That is, of course, a far cry from

(1967), which tested whether the placement of a listening device on the roof of a public telephone booth constituted a violation of the Fourth Amendment rights of persons using the booth. The questions framed by the parties were whether a public telephone booth is a "constitutionally protected area" such that attachment of the listening device violated the right to privacy of a user of the booth, and whether physical penetration of a "constitutionally protected area" is necessary for a search to be regarded as violative of the Fourth Amendment. The Court began by expressly rejecting that formulation of the issue, noting that "the correct solution of Fourth Amendment problems is not necessarily promoted by incantation of the phrase 'constitutionally protected area.'" *Id.* at 350, 88 S.Ct. at 510, 19 L.Ed.2d at 581. Elucidating that point, the Court stated:

> "[T]his effort to decide whether or not a given 'area,' viewed in the abstract, is 'constitutionally protected' deflects attention from the problem presented by this case. For the Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected."

*Id.* at 351–52, 88 S.Ct. at 511, 19 L.Ed.2d at 582 (citations omitted) (footnote omitted).

Turning then to the Government's argument that the lack of physical penetration of the telephone booth withdrew the matter from Fourth Amendment concern, the Court noted that, although at one time the absence of penetration was thought to foreclose further Fourth Amendment inquiry, that view no longer prevailed—that the underpinnings of that notion, set forth in cases such as *Olmstead v. United States,* 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928) "have been so eroded by our subsequent decisions that the 'trespass' doc-

---

the situation now before us—a shallow lawn in front of the house, upon which petitioner's children regularly played.

trine there enunciated can no longer be regarded as controlling." *Katz, supra,* 389 U.S. at 353, 88 S.Ct. at 512, 19 L.Ed.2d at 583.

In a concurring opinion, Justice Harlan noted that, although the Fourth Amendment did protect people rather than places, the protection it afforded required reference to a place. In a cogent and oft-quoted statement, he regarded the rule as being that "there is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'" *Id.* at 361, 88 S.Ct. at 516, 19 L.Ed.2d at 588 (Harlan, J., concurring). Thus, he explained, "a man's home is, for most purposes, a place where he expects privacy, but objects, activities, or statements that he exposes to the 'plain view' of outsiders are not 'protected' because no intention to keep them to himself has been exhibited." *Id.*

*Greenwood* fed, to a large extent, on *Katz,* and, in particular, on Justice Harlan's concurring opinion in *Katz.* After her suspicions had been aroused by other information indicating that Greenwood was engaged in drug trafficking, a police officer arranged with the neighborhood's regular trash collector to deliver to her the trash bags picked up from the street in front of Greenwood's house, and she used the evidence found in those bags to obtain a search warrant. The California courts dismissed the ensuing charges, finding that the warrantless trash searches violated the Fourth Amendment.[3]

The Supreme Court reversed. Conceding that Greenwood may have entertained some subjective expectation of privacy in that he "did not expect that the contents of [his] garbage

---

**3.** The California courts concluded that the trash searches also violated the California Constitution but noted that, under California law, evidence seized in violation of the State Constitution was not rendered inadmissible unless it was also in violation of the Federal Constitution. The issue at the Supreme Court level, centering on the usability of the evidence taken from the trash bags to establish probable cause for the warrant, thus hinged solely on Fourth Amendment jurisprudence.

bags would become known to the police or other members of the public," *Greenwood, supra,* 486 U.S. at 39, 108 S.Ct. at 1628, 100 L.Ed.2d at 36, the Court concluded that such an expectation was not objectively reasonable:

"Here, we conclude that respondents exposed their garbage to the public sufficiently to defeat their claim to Fourth Amendment protection. It is common knowledge that plastic garbage bags left *on or at the side of* a public street are readily accessible to animals, children, scavengers, snoops, and other members of the public. Moreover, respondents placed their refuse at the curb for the express purpose of conveying it to a third party, the trash collector, who might himself have sorted through respondents' trash or permitted others, such as the police, to do so. Accordingly, having deposited their garbage 'in an area particularly suited for public inspection and, in a manner of speaking, public consumption, for the express purpose of having strangers take it,' respondents could have had no reasonable expectation of privacy in the inculpatory items that they discarded."

*Id.* at 40–41, 108 S.Ct. at 1628–29, 100 L.Ed.2d at 36–37 (emphasis added) (footnotes omitted) (citations omitted) (quoting *United States v. Reicherter,* 647 F.2d 397 (3d Cir.1981)).

Reinforcing its conclusion that society would not accept as reasonable Greenwood's subjective claim to an expectation of privacy, the Court noted "the unanimous rejection of similar claims by the Federal Courts of Appeals" and the overwhelming rejection of such claims by the State appellate courts, citing a substantial number of Federal and State cases. *Id.* at 41–43, 108 S.Ct. at 1629–30, 100 L.Ed.2d at 37–38. In support of her claim that the *Greenwood* holding must be limited to its facts, respondent avers that most of the cases cited by the *Greenwood* Court involved either trash left in a public place outside the curtilage of the home or an initial pickup by the trash collector, not by the police. A careful reading of those cases shows, however, that, in some, those factors were not necessarily present and that, where they were present, they

were not regarded as significant.[4] The cases cited in *Green-*

4. In some of the cases involving direct seizure by the police, it is not at all clear whether the trash containers were placed within or without the curtilage. In *United States v. Dela Espriella*, 781 F.2d 1432 (9th Cir.1986), Federal agents searched trash containers "placed for curbside collection outside Rondero's home." *Id.* at 1437. Without ever noting whether that placement was within or without the curtilage of the home, the court simply concluded that "placing garbage for collection constitutes abandonment of the property" and that "[w]arrantless searches of abandoned property do not violate the fourth amendment." *Id.* In *United States v. Kramer*, 711 F.2d 789 (7th Cir.), *cert. denied*, 464 U.S. 962, 104 S.Ct. 397, 78 L.Ed.2d 339 (1983), police officers retrieved trash bags the defendant "had put by the roadside in front of his house to be collected by a private garbage removal service." *Id.* at 792. Although there was some dispute as to whether the bags were actually on the defendant's property, the court, in resolving the Fourth Amendment claim, assumed that the bags were taken from an area inside the defendant's perimeter fence. *Id.* Notwithstanding that the act of reaching over the fence and a few feet of the property to retrieve the bags thus constituted a technical trespass, the court found no Fourth Amendment violation. The protection afforded to people by that Amendment, the court held, "does not extend to their discarded garbage." *Id.* In *United States v. Vahalik*, 606 F.2d 99 (5th Cir.1979), *cert. denied*, 444 U.S. 1081, 100 S.Ct. 1034, 62 L.Ed.2d 765 (1980), the trash, seized directly by the police, had been placed "at the edge of the street for collection." *Id.* at 100. The court did not indicate whether that location was on the defendant's property but simply held that "the act of placing garbage for collection is an act of abandonment which terminates any fourth amendment protection." *Id.* at 101. *See also Commonwealth v. Minton*, 288 Pa.Super. 381, 432 A.2d 212, 215 (1981) (trash bag placed "at the curb side directly in front of the SCARLATA residence"); *State v. Schultz*, 388 So.2d 1326, 1327 (Fla.Dist.Ct.App. 1980) (trash bag seized from "swale area in front of the residence"). In *Cooks v. State*, 699 P.2d 653, 656 (Okla.Crim.App.), *cert. denied*, 474 U.S. 935, 106 S.Ct. 268, 88 L.Ed.2d 275 (1985), the challenged evidence—a bloody sock—was taken by a police officer from a garbage can "in the appellant's front yard." In *State v. Oquist*, 327 N.W.2d 587, 589 (Minn.1982), the trash bags were taken by police officers "near the public alley immediately behind the defendant's house." In *United States v. Michaels*, 726 F.2d 1307, 1312 (8th Cir.1984), the court declared the rule emanating from the various decisions to be that there is no expectation of privacy in trash placed for collection "in a public area, in close proximity to a public way, or in an outdoors communal trash container serving an apartment building."

Even where the trash bags had been placed in a location outside the curtilage, the decision did not appear to rest on that fact. Most of the courts, as in *United States v. Shelby*, 573 F.2d 971 (7th Cir.), *cert. denied*, 439 U.S. 841, 99 S.Ct. 132, 58 L.Ed.2d 139 (1978), simply adopted the notion that "[t]he placing of trash in the garbage cans at the time and place for anticipated collection by public employees for

*wood,* as a general rule, simply took the position that, when one places trash in, or even near, a public way for collection, the person loses any reasonable expectation of privacy in the material. The essence of the holdings was expressed in *United States v. Crowell,* 586 F.2d 1020, 1025 (4th Cir.1978), *cert. denied,* 440 U.S. 959, 99 S.Ct. 1500, 59 L.Ed.2d 772 (1979):

> "[A]bsent proof that a person has made some special arrangement for the disposition of his garbage inviolate, he has no reasonable expectation of privacy with respect to it once he has placed it for collection. The act of placing it for collection is an act of abandonment and what happens to it thereafter is not within the protection of the fourth amendment."

The law that has emerged since *Greenwood* is essentially the same as it was before that case was decided, although, as a general rule, it is based less on the property concept of abandonment than on the conclusion that, by depositing the trash in a place accessible to the public, for collection, the depositor has relinquished any reasonable expectation of privacy. *See, however, United States v. Redmon,* 138 F.3d 1109, 1114 (7th Cir.1998), and *compare with* concurring opinion by

hauling to a public dump signifies abandonment," which terminates any expectation of privacy. *Id.* at 973. *See also Commonwealth v. Chappee,* 397 Mass. 508, 492 N.E.2d 719, 722 (1986) (fact that trash bags are placed on public property is a significant factor to be considered in determining whether defendant had a reasonable expectation of privacy but is not controlling). Some seemed to conclude that such an abandonment effectively terminates any subjective expectation of privacy. *See, e.g., United States v. Reicherter,* 647 F.2d 397, 399 (3d Cir. 1981) (having placed trash in an area particularly suited for public inspection for express purpose of having strangers take it, "it is inconceivable that the defendant intended to retain a privacy interest in the discarded objects"); *United States v. Terry,* 702 F.2d 299 (2d Cir.) (once trash is discarded, former owner rarely has any further interest in it other than to be assured that it will not remain at his doorstep; mere use of opaque containers does not indicate an intent to retain a privacy interest), *cert. denied,* 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983). Other courts, without regard to any subjective expectation, held that any such expectation is just not reasonable. *See United States v. Crowell,* 586 F.2d 1020, 1025 (4th Cir.1978), *cert. denied,* 440 U.S. 959, 99 S.Ct. 1500, 59 L.Ed.2d 772 (1979).

Flaum, J., at 1125–29. The courts have not read *Greenwood* as being limited to situations in which the trash bags were either placed outside the curtilage or were taken from the property by the regular trash collector and then delivered to the police, although in some, one or both of those circumstances were present. One of the clearest expositions of the now-predominant view is in *State v. Kimberlin*, 267 Kan. 659, 984 P.2d 141 (1999). The trash bags there were seized by the police from "a little ditch area" located five to eight feet from the street and 35 to 40 feet in front of the defendant's house, where they had been placed for collection. The area was within a municipal easement but was assumed to be within the curtilage of the house. Kimberlin made the same argument advanced by respondent here—that *Greenwood* was distinguishable because it involved trash placed outside the curtilage. The Kansas court rejected the argument, noting that "[t]he *Greenwood* opinion used the term [curtilage] one time, in the opening sentence, and the curtilage concept was not part of the Court's rationale in deciding the issue." *Kimberlin, supra*, 984 P.2d at 144. It viewed the *Greenwood* holding as "based upon Greenwood's lack of a reasonable expectation of privacy in his discarded trash" and held that "under *Greenwood*, the search of defendant's trash herein was not constitutionally impermissible as claimed." *Id.*

A rationale for that view was given in *United States v. Hedrick*, 922 F.2d 396 (7th Cir.), *cert. denied*, 502 U.S. 847, 112 S.Ct. 147, 116 L.Ed.2d 113 (1991), where the trash bags were kept by the defendant throughout the week on a driveway 50 feet from the house, 20 feet from an unattached garage, and 18 feet from a public sidewalk, and were picked up from that location by the trash collectors. The issues were whether the containers were within the curtilage and, if so, whether that affected the applicability of *Greenwood*. The court held that the containers were technically within the curtilage, but, citing *Katz v. United States, supra*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576, held that "the mere intonation of curtilage ... does not end the inquiry." *Hedrick, supra*, 922 F.2d at 399.

Addressing the second issue, the court first drew a distinction between trash bags and other containers that might be found within the curtilage, the distinction being the "common knowledge" that "members of the public often sort through other people's garbage, and that the garbage is eventually removed by garbage collectors on a regular basis." *Id.* at 399. The question then became whether an "extension" of *Greenwood* could be justified either on the ground that placement of the garbage at the point chosen by the defendant made it readily accessible to the public or on the notion that the intent to convey the garbage to the collector itself sufficed to eliminate any expectation of privacy. The court rejected the second prospect as being inconsistent with the purpose of the Fourth Amendment, as it would allow the police to make warrantless searches of cans placed next to the house, without regard to their accessibility to the public as a whole and without probable cause. The proper focus, then, was whether the garbage was "readily accessible to the public so as to render any expectation of privacy objectively unreasonable." *Id.* at 400. That principle too, the court noted, was not without limit: the willingness of the public to trespass on private property to search through garbage could not be allowed to defeat the Fourth Amendment expectation of privacy. Parroting some of the language used in *Greenwood,* the court declared:

"Where, however, the garbage is readily accessible from the street or other public thoroughfares, an expectation of privacy may be objectively unreasonable because of the common practice of scavengers, snoops, and other members of the public in sorting through garbage. In other words, garbage placed where it is not only accessible to the public but likely to be viewed by the public is 'knowingly exposed' to the public for Fourth Amendment purposes."

*Id.*

On that premise, the court continued, if garbage is placed at the curb, the public has ready access to it from the street and can be expected to utilize that ability. Garbage cans placed next to the house or garage, however, are not sufficiently

accessible to the public to make an expectation of privacy unreasonable. In the case at hand, the court found that the cans were close enough to the sidewalk to be readily accessible to the public and thus knowingly exposed. *Hedrick* has been confirmed on several occasions by the Seventh Circuit Court. *See United States v. Shanks,* 97 F.3d 977 (7th Cir.1996) (garbage containers located on narrow strip of land between garage and alley; no expectation of privacy even if they were within the curtilage), *cert. denied,* 519 U.S. 1135, 117 S.Ct. 1002, 136 L.Ed.2d 881 (1997); *United States v. Redmon, supra,* 138 F.3d 1109 (no reasonable expectation of privacy in trash cans left for collection in common driveway just outside garage); *United States v. Long,* 176 F.3d 1304 (10th Cir.) (trash bags placed for collection on trailer located in grassy area seven feet from garage and three feet from alley; even if within curtilage, there would be no expectation of privacy), *cert. denied,* 528 U.S. 921, 120 S.Ct. 283, 145 L.Ed.2d 237 (1999).

When faced with the uncommon situation of trash containers being left for collection close to the house, the courts have, indeed, been wary of finding the relinquishment of an expectation of privacy. *See, e.g., United States v. Certain Real Property Located at 987 Fisher Road,* 719 F.Supp. 1396 (E.D.Mich. 1989) (garbage bags placed against back wall of house protected from warrantless search). In the more normal case of containers left at or near public streets, alleys, or other areas readily accessible to the public, there has been near unanimity in finding no reasonable expectation of privacy, whether or not the containers are technically within the curtilage. A few courts have found a violation under State law,[5] but none have interpreted *Greenwood* as being limited in the manner sug-

---

5. *See State v. Boland,* 115 Wash.2d 571, 800 P.2d 1112 (1990); *State v. Hempele,* 120 N.J. 182, 576 A.2d 793 (1990); *State v. Tanaka,* 67 Haw. 658, 701 P.2d 1274 (1985). Most courts faced with such an invitation, however, have rejected it. *See State v. DeFusco,* 224 Conn. 627, 620 A.2d 746 (1993); *People v. Hillman,* 834 P.2d 1271 (Colo.1992); *Moran v. State,* 644 N.E.2d 536 (Ind.1994); *State v. Rydberg,* 519 N.W.2d 306 (N.D.1994); *State v. Carriere,* 545 N.W.2d 773 (N.D.1996).

gested by respondent or by the dissent, as requiring either that the containers be placed outside the curtilage or that they be picked up first by the regular trash collector. *See United States v. Wilkinson*, 926 F.2d 22, 27 (1st Cir.) (Opinion by Breyer, J., rejecting distinction based on fact that containers left on defendant's lawn and not on curb itself), *cert. denied*, 501 U.S. 1211, 111 S.Ct. 2813, 115 L.Ed.2d 985 (1991). Most of the courts have applied *Greenwood* without any discussion of whether the containers were inside or outside the curtilage. *See United States v. Trice*, 864 F.2d 1421 (8th Cir.1988), *cert. denied*, 491 U.S. 914, 109 S.Ct. 3206, 105 L.Ed.2d 714 (1989); *Walls v. State*, 536 So.2d 137 (Ala.Crim.App.1988), *cert. denied*, 490 U.S. 1020, 109 S.Ct. 1744, 104 L.Ed.2d 181 (1989); *People v. Hillman*, 834 P.2d 1271 (Colo.1992); *State v. Fisher*, 591 So.2d 1049 (Fla.App.1991); *Perkins v. State*, 197 Ga.App. 577, 398 S.E.2d 702 (1990); *People v. Collins*, 106 Ill.2d 237, 87 Ill.Dec. 910, 478 N.E.2d 267, *cert. denied*, 474 U.S. 935, 106 S.Ct. 267, 88 L.Ed.2d 274 (1985); *People v. Thivierge*, 174 Mich.App. 258, 435 N.W.2d 446 (1988); *In re Forfeiture of U.S. Currency*, 181 Mich.App. 761, 450 N.W.2d 93 (1989); *State v. Texel*, 230 Neb. 810, 433 N.W.2d 541 (1989); *State v. Herrick*, 567 N.W.2d 336 (N.D.1997); *State v. Payne*, 104 Ohio App.3d 364, 662 N.E.2d 60 (1995).

■ This approach is entirely consistent with *Greenwood* and is the only reasonable one. The focus is on whether the person placed his or her trash, for collection, in an area at or near a public way or area, so that it was readily accessible to the public. If so, it matters not whether that area is technically within or without the boundary of the curtilage. As the North Dakota court stated in *State v. Herrick, supra*, 567 N.W.2d at 340, "[w]e will not engage in measuring expectations of privacy with a ruler." When dealing with trash set out for collection, making the perimeter of the curtilage decisive for Fourth Amendment purposes lacks any reasonable basis and would lead to wholly irrational results. Curtilage is a legal concept, not a surveying one. Most people probably have no idea what the word "curtilage" even means, much less where, on their property, it ends. Nor do they, as a practical

matter, give a moment's thought to whether the place where they set their trash for collection is within or without this unmarked boundary.

To suggest that the concept of curtilage has any meaning to people in the context of placing their trash for collection is absurd. They put their trash containers where they must put them if they wish the collector to take them. If there is no sidewalk or curb, the containers are likely to be placed on the lawn, close to the street or alley; if there is a strip between a sidewalk and the street, they are likely to be placed there; if the street immediately abuts a sidewalk, they may well be placed, as respondent did, on the lawn at the edge of the sidewalk, to avoid obstructing pedestrian traffic on the sidewalk. If there is a common area serving several residential units, they will be placed in that area. We have been referred to no empirical evidence that people have different privacy expectations depending on whether the place they put their trash for collection is within or without what, in hindsight, a court later finds to be the curtilage. Nor would it be reasonable to give credence to any such different expectations. If the trash is placed for collection at a place that is readily accessible, and thus exposed, to the public, the person has relinquished any reasonable expectation of privacy. The Court of Special Appeals erred in concluding otherwise.

JUDGMENT OF COURT OF SPECIAL APPEALS VACATED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO CONSIDER THE REMAINING ISSUES; COSTS IN THIS COURT TO BE PAID BY RESPONDENT; COSTS IN THE COURT OF SPECIAL APPEALS TO ABIDE THE RESULT.

Dissenting Opinion by RAKER, J. joined by BELL, C.J., and ELDRIDGE, J.

RAKER, Judge, dissenting:

I respectfully dissent. Because I believe that this Court's extension of the United States Supreme Court's holding in *California v. Greenwood*, 486 U.S. 35, 108 S.Ct. 1625, 100

L.Ed.2d 30 (1988), to a situation in which law enforcement officers trespass onto private property to remove garbage from within the curtilage[6] of Respondent's home is both unnecessary and unwise, I would affirm the decision of the Court of Special Appeals. To quote Chief Judge Posner, in his dissent in *United States v. Redmon*, 138 F.3d 1109, 1129 (7th Cir.1998), "[t]he better answer would be that searches, including searches of garbage, that take place within the curtilage of the defendant's property must comply with the Fourth Amendment's restrictions on searches."

The Court of Special Appeals held that "the warrantless 'trash runs' at issue in this case violated appellant's Fourth Amendment protection against unreasonable governmental intrusion." *Sampson v. State*, 130 Md.App. 79, 88, 744 A.2d 588, 593 (2000). Writing for the court, Chief Judge Murphy reasoned as follows:

> Although a resident who places a trash bag out for collection has no Fourth Amendment protection against the trash collector picking up the bag and turning it over to the police, the Fourth Amendment does prohibit a law enforcement officer from making a warrantless seizure of a trash bag located within the curtilage of the residence.

*Id.* I agree.

In my view, when a person places in front of his or her home a securely tied, opaque trash bag on his or her property, that person maintains a reasonable expectation of privacy at least until the trash is taken away by the trash collector. Justice Brennan recognized the eminently private nature of a person's trash in his dissent in *Greenwood*. He wrote:

> A single bag of trash testifies eloquently to the eating, reading, and recreational habits of the person who produced it. A search of trash, like a search of the bedroom, can relate intimate details about sexual practices, health, and

---

6. An area is considered part of the curtilage of a dwelling house if it "is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *United States v. Dunn*, 480 U.S. 294, 301, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987).

personal hygiene. Like rifling through desk drawers or intercepting phone calls, rummaging through trash can divulge the target's financial and professional status, political affiliations and inclinations, private thoughts, personal relationships and romantic interests. It cannot be doubted that a sealed trash bag harbors telling evidence of the "intimate activity associated with the 'sanctity of a man's home and privacies of life...." '

*Greenwood,* 486 U.S. at 50, 108 S.Ct. 1625, 100 L.Ed.2d 30 (Brennan, J., dissenting).

In *Greenwood,* the Court held that the Fourth Amendment does not prohibit the warrantless search and seizure of garbage that has been left for collection outside of the curtilage of a home after it has been picked up by the regular neighborhood trash collector and turned over to the police. *See id.* at 37, 108 S.Ct. 1625, 100 L.Ed.2d 30. The State argues that this case presents a straightforward application of *Greenwood,* despite the fact that the Supreme Court, in that case, repeatedly emphasized that the defendant's garbage had been left outside of the curtilage of his home and had been delivered to the police by the regular trash collector at the scheduled time of collection. *See id.* ("[Officer] Stracner asked the neighborhood's regular trash collector to pick up the plastic garbage bags that Greenwood had left on the curb in front of his house and to turn the bags over to her . . . ."); *id.* at 40, 108 S.Ct. 1625, 100 L.Ed.2d 30 ("It is common knowledge that plastic garbage bags *left on or at the side of a public street* are readily accessible to animals, children, scavengers, snoops, and other members of the public.") (emphasis added); *id.* at 42, 108 S.Ct. 1625, 100 L.Ed.2d 30 ("[T]he overwhelming weight of authority rejects the proposition that a reasonable expectation of privacy exists with respect to *trash discarded outside the home and the curtilege [sic] thereof.*") (quoting *United States v. Thornton,* 746 F.2d 39, 49 (D.C.Cir.1984)) (emphasis added); *Greenwood,* 486 U.S. at 42, 108 S.Ct. 1625, 100 L.Ed.2d 30 ("[O]f those state appellate courts that have considered the issue, the vast majority have held that the police may conduct warrantless searches and seizures of garbage *discarded in public areas.*" ) (emphasis added); *id.* at

43–44, 108 S.Ct. 1625, 100 L.Ed.2d 30 ("[S]ociety as a whole possesses no such understanding with regard to garbage *left for collection at the side of a public street.")* (emphasis added). In fact, in framing the issue in the majority opinion, Justice White stated: "The issue here is whether the Fourth Amendment prohibits the warrantless search and seizure of garbage left for collection *outside the curtilage of a home." Id.* at 37, 108 S.Ct. 1625, 100 L.Ed.2d 30 (emphasis added).

In this case, Respondent's garbage was seized directly by the police from her front lawn rather than by the regular garbage collector who would have had her consent to be there. Furthermore, unlike the garbage in *Greenwood,* it was seized prior to regular collection, even though Respondent and her codefendant testified that they would sometimes retrieve items from the garbage after it had been placed out for collection.

Given these clear distinctions between the Supreme Court's holding in *Greenwood* and this case, I have several reservations about the doctrinal and policy ramifications of extending *Greenwood* beyond its original holding. To begin with, the Court's holding today erodes the important concept of curtilage as it exists in Fourth Amendment jurisprudence and the Maryland common law. In *Oliver v. United States,* 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984), the Supreme Court first addressed the question of what role, if any, curtilage would still play in Fourth Amendment jurisprudence after the Court departed from the traditional framework of "constitutionally protected areas" to the reasonable expectation of privacy test enumerated in Justice Harlan's concurring opinion in *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring). The *Oliver* Court reaffirmed the importance of the curtilage/open fields distinction for the purpose of reasonable expectation of privacy analysis by holding that Fourth Amendment protection was limited to the area immediately surrounding the home and did not include "open fields," which it defined as the unoccupied or undeveloped area beyond the curtilage. *See Oliver,* 466 U.S. at 178, 180 n. 11, 181, 104 S.Ct. 1735, 80 L.Ed.2d 214.

In *United States v. Dunn,* 480 U.S. 294, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987), the Supreme Court articulated four factors that may be considered in determining whether a particular area is sufficiently associated with the intimate activities of the home to be considered within its curtilage and, therefore, entitled to the same Fourth Amendment protection as the home itself. Those four factors are: the proximity of the area to the home; whether the area is within an enclosure surrounding the home; the nature of the uses to which the area is put; and the steps taken to protect the area from observation by passers-by. *See Dunn,* 480 U.S. at 300–01, 107 S.Ct. 1134, 94 L.Ed.2d 326. The State emphasizes in this case the fact that Respondent's front yard was unfenced and open to the public, but the *Dunn* Court made clear that the presence of a fence is not dispositive, stating: "Fencing considerations are important factors in defining the curtilage, . . . but, . . . the primary focus is whether the area sufficiently harbors those intimate activities associated with domestic life and the privacies of the home." *Id.* at 301 n. 4, 107 S.Ct. 1134, 94 L.Ed.2d 326.

Maryland has also continued to recognize the concept of curtilage in Fourth Amendment jurisprudence. In *Everhart v. State,* 274 Md. 459, 337 A.2d 100 (1975), while noting that, in *Katz,* the Supreme Court had rejected the trespass doctrine as a predicate to invocation of Fourth Amendment protection, this Court stated:

> Thus, although it might seem more nearly constitutionally accurate that inquiry be made as to whether the place . . . where the search and seizure was made from the plastic bag was within an area where [the defendant] had a reasonably 'legitimate expectation of privacy,' it would seem, a fortiori, that if there was an intrusion geographically within the curtilage it would be within such a protected area, notwithstanding the fact that such plastic bag may have been within the officers' plain view.

*Id.* at 486, 337 A.2d at 115. We reasoned:

> The curtilage is as much to be protected against unlawful searches and seizures without a warrant as the dwelling

itself.... "Houses," as within the protection of the Fourth Amendment, include the curtilage.... A yard or lawn is considered within the protection of the curtilage and the mere absence of a physical barrier such as a fence, gate or hedge is not conclusive.

*Id.* at 484–85, 337 A.2d at 115.

In *Brown v. State,* 75 Md.App. 22, 540 A.2d 143 (1988), *cert. denied,* 313 Md. 31, 542 A.2d 858 (1988), the Court of Special Appeals held that the defendant's back yard was within the curtilage of his home because it was surrounded by a fence, in close proximity to the home, and used for picnics, cookouts, and laundry, even though the defendant's gate was open at the time that police entered his yard. *See id.* at 31, 540 A.2d at 147–48. The Court of Special Appeals also held that, since the back yard was not the same as a walkway or driveway, where visitors would ordinarily go, the police entry into the defendant's curtilage was a trespass and, therefore, a search for Fourth Amendment purposes. *See id.* at 34–35, 540 A.2d at 149. The court stated that "the law of trespass is a consideration, although not dispositive, on the issue of whether there has been a violation of the Fourth Amendment." *Id.* at 39, 540 A.2d at 151. The Court of Special Appeals further held that, when the defendant threw foil packets containing drug residue into his back yard, his actions did not constitute abandonment because "the property alleged to have been abandoned remained physically located in an area where he not only retained dominion but also had a reasonable expectation of privacy." *Id.* at 36, 540 A.2d at 150.

This central role of curtilage in Fourth Amendment jurisprudence is not only not *inconsistent* with the reasonable expectation of privacy analysis generated by *Katz,* but *complements* it. As Judge Posner explained in his dissent in *Redmon:*

[E]ver since the invention of wiretapping, which is a nontrespassory invasion of home or office, emphasis in the interpretation and application of the Fourth Amendment has shifted from the protection of property to the protection

of privacy. The emphasis that the courts have given to the distinction between "curtilage" and "open fields," and to the association of the former concept with intimacy, are instances of this refocusing of concern from the protection of property to the protection of privacy. . . . "Because expectations of privacy derive in part from the right to exclude others from the property in question, lawful possession is an important consideration in determining whether a defendant had a legitimate expectation of privacy in the area searched."

*Redmon,* 138 F.3d at 1130–31 (Posner, J., dissenting) (internal citations omitted).

In applying the *Dunn* factors to this case, while keeping in mind that the primary inquiry is whether Respondent's front yard harbored "intimate activities associated with domestic life and the privacies of the home," it seems clear that the area of her front yard invaded by the officers in this case was within the curtilage of her home and, therefore, entitled to Fourth Amendment protection. Respondent's garbage was seized from the small lawn in the "shallow front yard," maj. op. at 441, of the residential home that she rented. In fact, the majority concedes that the tree against which Respondent's garbage was placed was in "close proximity" to her house. Maj. op. at 442 n. 2.

The area in question is entirely unlike the marijuana fields in the woods behind the defendants' farms in *Oliver* or the commercial barn area behind the defendant's ranch house in *Dunn* and much more similar to the residential yards in *Everhart* and *Brown.* The Supreme Court, in *Dunn,* repeatedly pointed out that the area at issue in that case was "unoccupied" and "undeveloped." *See Dunn,* 480 U.S. at 304, 107 S.Ct. 1134, 94 L.Ed.2d 326. As the majority concedes:

In the *Dunn* case itself, the Court held that a barn on a 198–acre ranch, located inside a perimeter fence but 50 yards outside the fence surrounding the ranch house, was not within the curtilage of the house. That is, of course, a far cry from the situation now before us—a shallow front

lawn in front of the house, upon which respondent's children regularly played.

Maj. op. at 442 n. 2. In this case, Respondent's front yard is in close proximity to her home, is used regularly by her family for recreational activities, and is clearly closely associated with the private activities of her home life. While there is no fence surrounding the part of Respondent's yard from which the garbage was taken, that fact alone is not dispositive of whether she had a reasonable expectation of privacy in the area invaded. *See Everhart,* 274 Md. at 484, 337 A.2d at 115. Furthermore, while the trial court did not make a clear finding on the issue, there is evidence in the record to suggest that there were "No Trespassing" signs posted to protect Respondent's property at the time that the garbage was seized by the police.

The majority recognizes that this case differs from *Greenwood* in that the garbage was taken from within the curtilage of the home, *see* maj. op. at 441–43, but concludes, without further explanation, that the distinction is not "significant." *See id.* *Oliver* and *Dunn* and their progeny, as well as *Everhart* and *Brown,* would seem to suggest the contrary. The majority suggests that no courts have interpreted *Greenwood* as being limited to containers placed outside of the curtilage or first picked up by the regular trash collector, *see* maj. op. at 450, but that is not correct.

In *United States v. Certain Real Property Located at 987 Fisher Rd.,* 719 F.Supp. 1396 (E.D.Mich.1989), the United States District Court for the Eastern District of Michigan suppressed evidence seized as a result of a warrantless entry by police upon the curtilage of the defendant's real property to search and seize garbage set out in the back yard for ordinary garbage collection. *See id.* The court held that "[a]t the time the police officer entered the curtilage and seized the closed garbage bags from the rear of the house, the claimants retained an expectation of privacy in the bags in that area that society would recognize as reasonable," *id.* at 1404, and that, therefore, the police had "engaged in a 'search and seizure' within the meaning of the Fourth Amendment...." *Id.* at

1406. The court explained that "the doctrine of curtilage changes the complexion of fourth amendment analysis" and that "the location of the garbage—whether within or outside of the curtilage" was "particularly important." *Id.* at 1402. The court reasoned:

The location of the closed garbage bags within the curtilage of 987 Fisher Road, as opposed to the curbside, heightens a person's expectation of privacy in those bags as long as they remain in that area. On a continuum, nobody can retain a reasonable expectation of privacy in garbage that is at a garbage dump; in *Greenwood*, the Supreme Court held that any privacy expectation in garbage at a curbside is also not reasonable. Garbage bags close to home—in a garage waiting to be set out by the curbside, within the curtilage, or in a back porch—can engender privacy expectations. While the garbage bags remained within the curtilage, the claimants retained control over them and could have retrieved them or items contained in them. It is not unheard of for people to retrieve a newspaper or sales slip that had been mistakenly thrown away.

*Id.* at 1404–05.

More importantly, the question of whether *Greenwood*'s holding is limited to garbage placed outside of the curtilage of the home is not the appropriate inquiry. The fact that Respondent may lack a reasonable expectation of privacy in her garbage does not change the fact that she has a reasonable expectation of privacy in her front yard. The Court in *Greenwood* did not approve of the warrantless search of the defendant's garbage because of its nature as garbage, but rather because it had been discarded in a publicly accessible area and conveyed to a third party, thus rendering any subjective expectation of privacy in it objectively unreasonable. *See Greenwood,* 486 U.S. at 40–41, 108 S.Ct. 1625, 100 L.Ed.2d 30. As Judge Posner explained in *Redmon:*

The Fourth Amendment confers a right to security of person, home, papers, and effects against unreasonable searches and seizures. It is tempting to suppose that the search of a garbage can could never violate that right

because the act of discarding something as trash or garbage is a relinquishment of any interest in it. But that answer must be wrong, as it would entitle the police to enter the home itself and rifle the trash cans and wastepaper baskets found there. . . .

*Redmon,* 138 F.3d at 1129 (Posner, J., dissenting) (internal citations omitted). Professor LaFave explains:

[T]he *Greenwood* majority seems to view [the fact that the garbage was publicly accessible] as rather critical, for the Court repeatedly refers to the issue and holding in the case in terms of garbage "outside the curtilage," "on or at the side of a public street," "at the curb," "in an area accessible to the public," and "in public areas." . . . [P]olice have only limited authority to come onto the curtilage, for they must conduct themselves as would an ordinary social visitor to the premises. That hardly includes rummaging through the garbage cans of one's host.

WAYNE R. LAFAVE, SEARCH AND SEIZURE § 2.6(c), at 594–95 (3rd ed. 1996) (Pocket Part 2001) (footnotes omitted). A more appropriate inquiry, therefore, would be whether courts continue to treat the distinction between curtilage and open fields as significant for Fourth Amendment purposes, which they clearly do. *See, e.g., United States v. Jenkins,* 124 F.3d 768, 771 (6th Cir. 1997) (holding that the warrantless physical invasion and seizure of items from the defendants' back yard violated the Fourth Amendment because the back yard was part of the curtilage of their home, based on the fact that the back yard was small and immediately accessible from a sliding glass door in the back of the house, well-tended, used for gardening and laundry, and shielded by the house and woods); *State v. Rogers,* 161 Vt. 236, 638 A.2d 569, 573 (1993) (holding that a marijuana garden was within the curtilage of the home because the area was 150 feet from the home, within a natural tree barrier, and was also used for vegetable gardening, but that police observation of the garden was not a "search" within the meaning of the Fourth Amendment because the police did not physically penetrate the garden); *State v. Lange,* 158 Wis.2d 609, 463 N.W.2d 390, 391 (App.1990) (holding that a

garden from which a marijuana bud was seized was within the curtilage of the defendant's property because it was within ten yards of the home, within a tree boundary, and was used for laundry and vegetable gardening and that curtilage is automatically entitled to Fourth Amendment protection).

Furthermore, the majority opinion ignores the importance of the property concept of trespass in determining the objective reasonableness of a defendant's expectation of privacy under the *Katz* framework. While the Supreme Court, in *Katz*, specifically rejected the trespass doctrine as singularly defining the scope of Fourth Amendment protections, *see Katz*, 389 U.S. at 353, 88 S.Ct. 507, 19 L.Ed.2d 576, the Court also has repeatedly reiterated that trespass is one factor to be considered in determining whether an individual has a reasonable expectation of privacy in a particular area. *See Oliver*, 466 U.S. at 183, 104 S.Ct. 1735, 80 L.Ed.2d 214 ("The existence of a property right is but one element in determining whether expectations of privacy are legitimate."). The fact that the search and seizure of garbage in this case occurred only as the result of a police trespass into the curtilage of Respondent's home indicates that she had a significantly more legitimate expectation of privacy, both subjectively and objectively, than the defendant in *Greenwood.* As Professor La-Fave explains:

As for the [rationale that the garbage had been conveyed to the trash collector] given in *Greenwood,* that might support the conclusion the police can enlist the aid of the garbage hauler even as to garbage within the curtilage, but it hardly means that the police may themselves intrude. There is no principle in Fourth Amendment jurisprudence to the effect that the police are free to do what *some* individual has been authorized to do.

LaFave, *supra*, § 2.6(c), at 595 (footnotes omitted). As he further notes: "In coming onto the curtilage and taking the trash, the collector is doing exactly what the householder contemplated." LaFave, *supra*, § 2.6(c), at 602. Therefore, Professor LaFave concludes:

Thus, when the police come on to private property to conduct an investigation or for some other legitimate purpose and restrict their movements to places visitors could be expected to go (e.g., walkways, driveways, porches), observations made from such vantage points are not covered by the Fourth Amendment. But other portions of the lands adjoining the residence are protected, and thus if the police go upon these other portions and make observations there, this amounts to a Fourth Amendment search, and this is so even if these other portions are themselves clearly visible from outside the curtilage.

LaFave, *supra*, § 2.3(f), at 506–09 (footnotes omitted).

Judge Posner made a similar point in his *Redmon* dissent:

Most homeowners extend an implicit invitation to social and business invitees to walk up to the front door, but in doing so the homeowner does not, as it were, "waive curtilage." The social and business invitee, including a police officer whether invited or uninvited, must confine himself to the prescribed route, rather than treating the invitation as one to roam the property at will, peering in to the windows of the home.

*Redmon,* 138 F.3d at 1130 (Posner, J., dissenting) (citations omitted).

As the United States Court of Appeal for the Eighth Circuit explained in *United States v. Biondich,* 652 F.2d 743 (8th Cir.1981):

A person ordinarily retains some expectation of privacy in items that remain on his or her property, regardless of whether they are placed in an automobile, a home, or a garbage can. When a person makes arrangements with a sanitation service to have the items picked up, however, and when the items are placed in the designated place for collection and the regular collector makes the pickup in the usual manner on the scheduled collection day, the person loses his or her legitimate expectation of privacy in the items *at the time they are taken off his or her premises.*

*Id.* at 745 (emphasis added). *See State v. Hauser,* 342 N.C. 382, 464 S.E.2d 443, 447 (1995) (upholding warrantless garbage search by police, but only because it occurred "after pickup by the regular collector in the normal manner" because "the defendant retained no legitimate expectation of privacy in his garbage once it left his yard in the usual manner."). Furthermore, the fact that the police made a specific point of not stepping on Respondent's lawn, but rather reached over her lawn from the sidewalk to the garbage that was placed two or three feet inside her property line, suggests that even the investigating officers recognized a significance in Respondent's property line. Unfortunately, they failed to recognize that a trespass occurs whenever the vertical plane of the property line is breached. *See* RESTATMENT (SECOND) OF TORTS, § 159 cmt. f, illus. 3 (1965).

In addition, the Court's holding today, and its failure to establish any bright line rule for Fourth Amendment purposes, pose serious administrative complications for law enforcement officers seeking to perform warrantless garbage searches on private property in the future. In *Oliver,* the Supreme Court reaffirmed the doctrinal significance of the distinction between curtilage and open fields, in part, because of concerns about the practical administration for law enforcement officers of a more case-by-case approach to determining whether or not defendants had a reasonable expectation of privacy in open fields:

Nor would a case-by-case approach provide a workable accommodation between the needs of law enforcement and the interests protected by the Fourth Amendment. Under this approach, police officers would have to guess before every search whether landowners had erected fences sufficiently high, posted a sufficient number of warning signs, or located contraband in an area sufficiently secluded to establish a right of privacy.... This Court repeatedly has acknowledged the difficulties created for courts, police, and citizens by ad hoc, case-by-case definition of Fourth Amendment standards to be applied in differing factual circumstances.... The ad hoc approach not only makes it difficult

for the policeman to discern the scope of his authority, ...
it also creates a danger that constitutional rights will be
arbitrarily and inequitably enforced.

*Oliver*, 466 U.S. at 181, 104 S.Ct. 1735, 80 L.Ed.2d 214
(internal citations omitted). The Supreme Court concluded by
pointing out:

The clarity of the open fields doctrine ... is not sacrificed
... by our recognition that the curtilage remains within the
protections of the Fourth Amendment. Most of the many
millions of acres that are "open fields" are not close to any
structure and so not arguably within the curtilage. And, for
most homes, the boundaries of the curtilage will be clearly
marked; and the conception defining the curtilage—as the
area around the home to which the activity of home life
extends—is a familiar one easily understood from our daily
experience.

*Id.* at 182 n. 12, 104 S.Ct. 1735, 80 L.Ed.2d 214.

The majority opinion fails to heed the *Oliver* Court's warn-
ings. It leaves no guidance for law enforcement officers on
the permissible scope of "trash runs" in the future, nor even
any clear doctrinal rule for when an individual has a reason-
able expectation of privacy in containers located on his or her
private property. The majority seems to suggest that gar-
bage placed next to a house or garage would not be "*suffi-
ciently accessible* to the public to make an expectation of
privacy unreasonable," maj. op. at 449–50 (emphasis added),
but also holds that cans that are "*close enough* to the sidewalk
to be readily accessible to the public and thus knowingly
exposed," *id.* (emphasis added), are not protected by the
Fourth Amendment. The majority suggests that application
of the bright line curtilage test "lacks any reasonable basis
and would lead to wholly irrational results," maj. op. at 451,
disdaining " 'measuring expectations of privacy with a ruler.' "
Maj. op. at 451 (quoting *State v. Herrick*, 567 N.W.2d 336, 340
(N.D.1997)). But that criticism applies with greater force to
the rule established today by the majority. The test that the
majority seems to institute for whether an individual has a

reasonable expectation of privacy in garbage containers on his or her private property is whether those containers are sufficiently "close to the house." *Id.* at 450. In contrast, the police are already constrained by the curtilage test in other Fourth Amendment contexts; there is no reason to develop an independent jurisprudence simply based on the *nature* of the seized evidence—namely, garbage.

The clear distinction between open fields and curtilage has long been recognized in federal and Maryland common law and has been repeatedly applied in the Fourth Amendment context. It seems unnecessary, at this point, to abandon that concept and with it any hope of establishing a bright line rule for the permissibility of warrantless garbage searches. Under the reasoning of *Katz,* it also seems substantially more likely that society would be willing objectively to recognize a legitimate expectation of privacy in anything, including garbage, that begins at the curtilage and lasts until removal by the garbage collector.

As the U.S. District Court in *987 Fisher Rd.* opined when it suppressed the evidence received from the claimant's trash:

> The court queries whether allowing police one step within the curtilage to search and seize garbage bags allows the next step through the door. The court believes that that step should not have been taken under the facts of this case.... [T]he government decided to do directly what it already could do indirectly, and that trip up the side driveway makes all the difference for fourth amendment purposes.

*987 Fisher Rd.,* 719 F.Supp. at 1407.

Judge Posner expressed similar concerns in his dissent in *Redmon:*

> [R]ather than subject the police to the uncertainty of guessing where we will ultimately draw the line, we should adhere to the distinction between the curtilage and open fields, and permit no garbage searches, without a warrant or probable cause, within the curtilage.... [T]he best rule, the one that best reconciles the interests of privacy, crime

control, and ease of administration, is the one that I have suggested—drawing the line at the curtilage.

*Redmon,* 138 F.3d at 1132 (Posner, J., dissenting).

I would affirm the decision of the Court of Special Appeals that the warrantless garbage searches and seizures at issue in this case violated Respondent's Fourth Amendment rights. Accordingly, I respectfully dissent.

Chief Judge BELL and Judge ELDRIDGE have authorized me to state that they join in this dissent.